GOSWAMI, Appellant,

v.

GOSWAMI, Appellee.

[Cite as *Goswami v. Goswami*, 152 Ohio App.3d 151, 2003-Ohio-803.]

Court of Appeals of Ohio,
Seventh District, Belmont County.

No. 01 BA 39.

Decided Feb. 20, 2003.

152

The Costine Law Firm and Eric Costine; Hoffman Law Office and Grace L. Hoffman, for appellant.

Lancione & Lloyd, Tracey Lancione Lloyd and Richard L. Lancione, for appellee.

WAITE, Presiding Judge.

{¶ 1} This timely appeal arises out of a divorce decree granted to appellant Naba Goswami and appellee Sarah Shamin Goswami. Appellant raises ten assignments of error relating to the valuation and division of the marital debts and assets. Based on our analysis, we sustain appellant's first, fifth, and ninth assignments of error, and remand this case for further proceedings.

## A. PROCEDURAL HISTORY

{¶ 2} The parties were married on February 14, 1978. On December 13, 1999, appellant filed for divorce in the Belmont County Court of Common Pleas. Appellee filed an answer and counterclaim for divorce on January 20, 2000.

{¶ 3} On February 14, 2000, the trial court filed a journal entry setting forth temporary orders during the pendency of the divorce. One of those orders was that "each of parties shall be responsible for one-half of the mortgage payments * * * in all real estate owned by them situated in Belmont County, Ohio."

{¶ 4} Over the next months, the parties attempted to resolve the disputed issues in the divorce by utilizing a mediator. The mediator was attorney Harry W. White. After three mediation sessions, it was clear that no mediated divorce settlement was forthcoming, and the divorce was set for hearing. On February 22, 2001, the trial court determined that there were grounds for divorce but held that no divorce decree would issue until all other disputed matters were resolved.

{¶ 5} On March 15, 2001, appellant filed a motion requesting that the former mediator, attorney Harry W. White, be appointed as referee in the case pursuant to Civ.R. 53 and 75.

{¶ 6} With appellee's consent, on March 26, 2001, the court appointed attorney White to be the magistrate overseeing the case.

{¶ 7} A contested divorce hearing was held on April 9, 2001.

{¶ 8}   Attorney White filed his magistrate's report on April 27, 2001.   The report allocated $665,775 in assets to appellee and $662,525 in assets to appellant. To achieve this result, the magistrate awarded appellee more in-kind assets but ordered appellee to pay $85,000 to appellant over a five-year period.   The magistrate also ordered appellant to reimburse appellee $14,400 for overpayments she had made on the Belmont County mortgages during the pendency of the divorce.

{¶ 9}   On May 11, 2001, appellant filed eleven objections to the magistrate's report.   Appellee filed a response on May 18, 2001.   On June 18, 2001, the trial court overruled appellant's objections.   The court made one correction to the magistrate's report, reducing the amount that appellee was to be paid for overpayments of the Belmont County mortgages from $14,400 to $10,100.

{¶ 10}   On June 27, 2001, the trial court filed its judgment decree of divorce. The court found that the parties had been citizens of India and had become citizens of the United States, that both parties were licensed medical doctors, that both parties had their own separate medical practices, and that they had acquired personal and real property in the United States and India.   The court followed the magistrate's asset valuations and the magistrate's allocation of debts and assets, including the modified amount of $10,100 for appellee's mortgage overpayments.

{¶ 11}   On July 24, 2001, appellant filed a timely notice of appeal.

## B.   ARGUMENTS ON APPEAL

{¶ 12}   Appellant presents ten assignments of error, some of which overlap each other.   The arguments will be presented in an order more convenient for our analysis.

### 1.   VALUATION ISSUES.

#### a.   ASSIGNMENT OF ERROR NO. 2

{¶ 13}   Appellant's second assignment of error asserts:

{¶ 14}   "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence in determining the valuation of the flat on the appellant's ancestral property."

{¶ 15}   There was considerable discussion at trial about a building in Uzan Bazar, Guwhati, India.   The property was described as a second-story condominium, known in India as a flat (hereinafter, the "Flat"), titled jointly between appellant and six of his siblings.   Appellee submitted an appraisal of the Flat and

had Mr. Satyabrata Barua, the appraiser, testify at the divorce hearing in support of the appraisal.

{¶ 16}   Appellant contends that the trial court should not have relied on appellee's appraisal.   Appellant argues that Barua did not visit the property, mistakenly referred to the property as having 4,000 square feet, and failed to consider that the property had numerous owners, which prevented it from being sold.   Appellee argues that her appraiser visited the property and correctly determined that the property was 3,600 square feet.   Appellee argues that the trial court was within its discretion to choose Barua's appraisal value over that of appellant's appraisal.

{¶ 17}   Appellant also argues that the court should have discounted the property by 10 percent for lack of marketability.   Appellant presents no explanation as to why the valuation should be discounted 10 percent.   Appellant points to Plaintiff's Exhibit H, which purports to be a family-ownership agreement.   Nothing in Exhibit H explains why the property should be discounted 10 percent.

{¶ 18}   Appellee argues that Barua did visit the property and that the trial court had the discretion to rely on his appraisal, particularly since appellant did not actually make a separate appraisal or submit any expert testimony on the valuation issue.   Appellee's argument is correct.

{¶ 19}   A trial court's valuation of marital assets will be reversed only for an abuse of discretion.   *James v. James* (1995), 101 Ohio App.3d 668, 681, 656 N.E.2d 399; *Focke v. Focke* (1992), 83 Ohio App.3d 552, 554, 615 N.E.2d 327.   In divorce proceedings, "the trier of fact is not bound by the appraisal or valuation methodology used by any expert witness." *Anderson v. Anderson* (2002), 147 Ohio App.3d 513, 526, 771 N.E.2d 303.

{¶ 20}   Barua testified that he visited the Flat. Although appellant insists that the Flat was only 3,600 square feet, Barua appears to have measured the Flat and made his own determination as to its dimensions, which was closer to 4,000 square feet.   Barua valued the Flat at 26 lacs[1] 32,057 rupees, which translates to approximately $56,300.

{¶ 21}   Appellant failed to provide an expert appraiser at trial.   He did provide a valuation report of the Flat. The report was created in 1999 for insurance purposes and not for purposes of the divorce litigation.   The report valued the Flat at 12 lacs, which translates to $26,568.

---

1.  The "rupee" is the basic monetary unit of India.  A "lac" is 100,000 rupees.  The parties agreed that one United States dollar would be valued at 46.75 rupees, which corresponds to one rupee as $.0214 and one lac being worth approximately $2,139.

{¶ 22} The trial court was left with two appraisals of the property, only one of which was prepared for purposes of this litigation. Appellee also called its appraiser as a witness at trial, who thoroughly explained his appraisal methods. The trial court apparently believed appellee's appraiser and used his appraisal value. A trial court's determinations concerning the credibility of witnesses are given great deference by a reviewing court. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Therefore, there is no error in the trial court's decision to adopt the valuation used by appellee's expert appraiser. Appellant's second assignment of error is overruled.

### b. ASSIGNMENT OF ERROR NO. 3

{¶ 23} Appellant's third assignment of error asserts:

{¶ 24} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence in determining the valuation of the parties' medical practices."

{¶ 25} Appellant argues that the trial court impermissibly placed a higher value on his medical practice than the appraisals of either of the parties' experts. The trial court, while considering both the experts' testimony and valuation information, devised his own method of valuing appellant's medical practice, based on the valuation principles set forth by appellant's expert, James F. Kacsmar.

{¶ 26} A trial court's valuation of marital assets will be reversed only for an abuse of discretion. *James,* 101 Ohio App.3d at 681, 656 N.E.2d 399; *Focke,* 83 Ohio App.3d at 554, 615 N.E.2d 327. In divorce proceedings, "the trier of fact is not bound by the appraisal or valuation methodology used by any expert witness." *Anderson,* 147 Ohio App.3d at 526, 771 N.E.2d 303.

{¶ 27} The court admitted into evidence, as the court's own exhibit, the deposition and valuation reports of appellant's expert, Kacsmar, a certified public accountant. Kacsmar was hired by appellant to determine the value of both parties' medical practices. Kacsmar used the capitalization-of-earnings method to value the medical practices.

{¶ 28} Under the capitalization-of-earnings method of valuation, an expert estimates the income of a business on the basis of the business's net cash flow or net earnings. 1 Fishman, Pratt, Griffith, Wilson, Guide to Business Valuations (2d Ed.1992) 5–1, Section 500.02. A capitalization rate or discount rate is then applied to the historical earnings of the business. Id. at 5–6, Section 505.05. The discount rate "represents the total expected rate of return * * * that a buyer (or investor) would demand on the purchase price of an ownership interest in an asset * * * given the level of risk inherent in that ownership interest." Id. at 5–5, Section 505.02.

{¶ 29} Kacsmar averaged the results of a 30 percent and a 50 percent capitalization rate on a calculated average income of $9,207. Using these figures, Kacsmar valued appellant's medical practice at $24,551, which is equivalent to a 37.5 percent capitalization rate. In other words, if an average investor weighed the risks of investing in appellant's medical practice, he or she would expect an annual return of 37.5 percent on an investment of $24,551, which would generate an annual income of $9,207. Kacsmar supposedly used the income figures that were listed on appellant's 1997, 1998, and 1999 federal tax returns, but those tax returns are not part of the record.

{¶ 30} Appellee hired Diana Kennon, a certified public account, to review Kacsmar's calculations. Kennon determined that appellant had received an annual income from East Ohio Regional Hospital ("EORH") of $113,450 starting on October 12, 1995, and ending on January 31, 1999. Kennon found that this income was not reported on appellant's tax returns because it was given in the form of an advance or loan. Appellant and EORH had an arrangement wherein most of the loan would be forgiven at a future date, and at that future date the part of the loan that was forgiven would be reportable as appellant's income. Kennon determined that EORH had advanced a total of $453,000 to appellant. There was also evidence that appellant owed EORH $55,586.46 in interest on the EORH loans.

{¶ 31} Kennon determined that appellant's calculated salary for 1997 and 1998 should have been $114,000 more than the figure used by Kacsmar due to the loans (and the forgiveness of those loans) by EORH. Using the same capitalization rate as Kacsmar, she calculated the value of appellant's practice to be $226,240.

{¶ 32} Kennon admitted that the method she and Kacsmar used to value the medical practices was "a very quick way to value the businesses."

{¶ 33} The record contains a "Physician Recruitment Agreement" between appellant and EORH that is consistent with the Kennon's testimony. There is also a letter from David T. Barank, Senior Vice President of EORH, which states that appellant owed EORH $509,393.46 in the beginning of 1999, and that $346,393.36 of that obligation was being forgiven over a number of years. The record shows that $48,571.49 was forgiven in 1999, and that $70,000 to $80,000 was due to be forgiven each of the next seven years. The amount ultimately scheduled to be forgiven was approximately $100,000 more than $346,393, because interest would continue to accrue on the outstanding loan amount over the next seven years, and that added interest was also due to be forgiven.

{¶ 34} The trial court concluded that the loans from EORH that were advanced in 1997 and 1998 should have been treated as income in Kacsmar's appraisal of appellant's medical practice. Although the forgiven loans were not

treated as income in 1997 and 1998 for tax purposes, the trial court was not making a tax analysis and would not be constrained by tax valuation principles. Instead of averaging appellant's income over three years, which was the method used by both Kennon and Kacsmar, the trial court simply estimated appellant's income for 1999, and applied a 40 percent discount rate to the amount. The trial court estimated appellant's income to be $104,000 in 1999, based on a contract he had signed with EORH beginning on February 1, 1999, with an initial annual salary of $104,000. The trial court decided to ignore all other sources of appellant's income for purposes of valuing his medical practice. Using these figures, the trial court estimated appellant's medical practice to be worth $260,000.

{¶ 35} This number is considerably higher than Kacsmar's appraisal for obvious reasons—Kacsmar did not take into account the income stream from EORH. The court's valuation is also higher than Kennon's because Kennon used the average income over three years, 1997–1999, but adjusted only the income from 1997 and 1998 due to the EORH income. Kennon failed to make any adjustments for 1999 and also failed to adjust for the additional $100,000 that would be forgiven in added interest expense on the EORH loan until the loan was paid off in 2005.

{¶ 36} Looking closely at appellant's profit/loss statement for 1999, as prepared by Kacsmar, it appears that the trial court's income estimate was well below appellant's actual income for that year. Appellant had receipts of $329,771 and expenses of $192,818, for an income of $136,953. Appellant's expenses were inflated due to a $66,721 accumulated interest expense primarily arising from his accumulated loans from EORH. Kennon noted this extraordinary expense but did not adjust for it. Only a small portion of this interest expense would have been attributable to advances made by EORH in 1999, and most of it should have been excluded in the process of determining appellant's net income for 1999. If the trial court had taken more factors into account, it would have arrived at a value for appellant's income stream that was much higher than the $104,000 amount it settled upon.

{¶ 37} The trial court also used a more favorable discount factor than that used by Kacsmar or Kennon. The trial court used a 40 percent discount factor, whereas the two experts used a 37.5 percent factor. Although Kacsmar indicated that he used an "average of the two capitalization rates" of 50 percent and 30 percent, the actual figures indicate that Kacsmar used a 37.5 percent rate. Using the 37.5 percent discount factor, appellant's medical practice would have been valued at $277,333, whereas the court actually valued the medical practice at $260,000. The valuation is achieved by dividing the estimated income stream by

the discount factor, i.e., $104,000 divided by .40 or .375, depending on which discount factor is being used.

{¶ 38} The trial court was within its discretion in modifying both of the valuations of the parties' experts due to deficiencies in the analyses of both experts. The court's valuation is significantly lower than the valuation could have been, according to the financial information contained in the record. Appellant was therefore not prejudiced by any imprecise mathematical calculation used by the court.

{¶ 39} Appellant also argues that the trial court did not take into account the "goodwill" of the parties' medical practices. "Goodwill" is "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." *Spayd v. Turner, Granzow & Hollenkamp* (1985), 19 Ohio St.3d 55, 59–60, 19 OBR 54, 482 N.E.2d 1232, citing Story, Commentaries on the Law of Partnership (6th Ed.1868) 170, Section 99.

{¶ 40} If a business is included as part of the assets in a divorce proceeding, the goodwill of the business may usually be treated as part of the marital assets. *Kahn v. Kahn* (1987), 42 Ohio App.3d 61, 64, 536 N.E.2d 678. There are some problems, though, with valuing the goodwill of a one-person medical practice because any goodwill would be personal to the individual doctor such that it would be unalienable and untransferable. See, e.g., *Fexa v. Fexa* (1990), 396 Pa.Super. 481, 578 A.2d 1314.

{¶ 41} Assuming that appellant's medical practice had goodwill associated with it, the value of that goodwill was incorporated into the overall valuation of his medical practice. The "capitalization of income" valuation method is used to value an entire business and does not attempt to value the individual assets of the business. 1 Fishman, Pratt, Griffith, Wilson, Guide to Business Valuations (2d Ed.1992) 2–19, Section 220.20; Goldberg, Valuation of Divorce Assets (1984) 142 f., Section 6.6; Turner, Equitable Distribution of Property (2d Ed.1994) 542, Section 7.08. Because appellant's entire business was given a value, there is no reason to separately value the goodwill, if indeed there is any goodwill value.

{¶ 42} The trial court did not abuse its discretion in valuing appellant's medical practice, and the third assignment of error is overruled.

### c.  ASSIGNMENT OF ERROR NO. 10

{¶ 43}  Appellant's tenth assignment of error asserts:

{¶ 44}  "The trial court abused its discretion by awarding the appellant the medical equipment and furnishings located in India."

{¶ 45}  Although this error is worded as an error about the allocation of assets, appellant's actual argument makes it clear that he disagrees with the way the court valued certain medical equipment that was located in India.  As previously stated, a trial court's valuation of marital assets will be reversed only for an abuse of discretion.  *James*, 101 Ohio App.3d at 681, 656 N.E.2d 399.

{¶ 46}  Appellee submitted evidence at trial that the medical equipment was worth $13,400.  Appellant did not introduce any evidence rebutting appellee's valuation.  Appellant's argument on appeal relies on supposed evidence that was not presented at trial.  "A reviewing court cannot add matter to the record that was not part of the trial court's proceedings and then decide the appeal based on the new matter."  *McAuley v. Smith* (1998), 82 Ohio St.3d 393, 396, 696 N.E.2d 572.  There is evidence in the record supporting the trial court's valuation of the medical equipment, and we find no abuse of discretion in the court's reliance on that evidence.  The tenth assignment of error is overruled.

### 2.  DEFINING ASSETS AND DEBTS AS MARITAL ASSETS AND DEBTS.

### a.  ASSIGNMENTS OF ERROR NOS. 1 AND 8

{¶ 47}  Appellant's first and eighth assignments of error assert:

{¶ 48}  "The trial court abused its discretion, committed reversible error, and ruled against the manifest weight of the evidence in its determination that the Ramsai Hill property was a marital asset."

{¶ 49}  "The trial court abused its discretion, committed reversible error, and ruled against the manifest weight of the evidence when allocating the parties' debts."

{¶ 50}  These two assignments of error deal with determinations about whether certain assets or debts should be treated as marital assets or debts.

{¶ 51}  "Marital property" is any real or personal property acquired during the marriage, as defined by R.C. 3105.171(A)(3):

{¶ 52}  "(3)(a) 'Marital property' means, subject to division (A)(3)(b) of this section, all of the following:

{¶ 53}  "(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the

spouses, and that was acquired by either or both of the spouses during the marriage;

{¶ 54} "(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

{¶ 55} "(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;

{¶ 56} "(iv) A participant account, as defined in section 148.01 of the Revised Code, of either of the spouses, to the extent of the following: the moneys that have been deferred by a continuing member or participating employee, as defined in that section, and that have been transmitted to the Ohio public employees deferred compensation board during the marriage and any income that is derived from the investment of those moneys during the marriage; the moneys that have been deferred by an officer or employee of a municipal corporation and that have been transmitted to the governing board, administrator, depository, or trustee of the deferred compensation program of the municipal corporation during the marriage and any income that is derived from the investment of those moneys during the marriage; or the moneys that have been deferred by an officer or employee of a government unit, as defined in section 148.06 of the Revised Code, and that have been transmitted to the governing board, as defined in that section, during the marriage and any income that is derived from the investment of those moneys during the marriage.

{¶ 57} "(b) 'Marital property' does not include any separate property."

{¶ 58} Under this definition, marital property includes real property which is owned and titled in fee simple absolute by the parties, as well as other types of property interests. Marital property, by necessity, also encompasses marital debts, because those debts affect the parties' ultimate interest in their property. *Easterling v. Easterling* (Apr. 13, 2001), 2d Dist. No. 18523, 2001 WL 369734.

{¶ 59} Appellant raises three issues in these assignments of error.

### 1. The Ramsai Hill property.

{¶ 60} Appellant first argues that the property in India referred to as the "Ramsai Hill" property should not have been designated as marital property. This property consisted of approximately one acre of undeveloped land in Kaharghuli, Guwhati, India. The property was purchased by appellant's brother, Anil Goswami. There is some evidence that Anil intended to build a medical

center on the property and that he intended to make a gift of part of the property to appellant's two children.

{¶ 61}  There is no definitive document in the record establishing who has title to the Ramsai Hill property.  There was testimony by Anil Goswami, appellant's brother, that Anil purchased the property and now holds it jointly in his name and in the name of appellant's two children.  The trial court, though, was not concerned only with who held the title to the property.  Property that is paid for with marital funds, but that is titled or held in the name of a third party, may be treated as marital property. *Baker v. Baker* (1992), 83 Ohio App.3d 700, 703, 615 N.E.2d 699.  The real issue before the court was whether marital funds were used to purchase the Ramsai Hill property.

{¶ 62}  Appellant and Anil Goswami testified that no marital funds were used to purchase the property.  Appellee testified that she and appellant made the arrangements to purchase the Ramsai Hill property from the Indian government but that appellant's family actually paid for the property:

{¶ 63}  "[Appellee:] I used to talk to Doctor Goswami [appellant] about that plot of land at Ramsai Hill. I was concerned about that deed.  He would tell me that his brother was working on it and that these things take a long time.  So basically one never gets to see the real deed.

{¶ 64}  "THE REFEREE: If I can just interrupt for a moment, when you said that the family paid the two to three lacs, what family are we talking about?

{¶ 65}  "[Appellee:] His family, Doctor Goswami's family."

{¶ 66}  There is no other evidence in the record indicating that any of the parties' assets were used to pay for the Ramsai Hill property.  Appellee did state at one point that the Ramsai Hill property "was supposed to be [appellant's] and mine, too."  Whatever appellee meant by this statement, it cannot mean that she claimed to have owned the property by virtue of paying for it, because she clearly testified that neither she nor appellant paid for it.  Therefore, the trial court erred in including the Ramsai Hill property as part of the marital property. Assignment of error number one is sustained.

### 2.  The $49,000 Loans.

{¶ 67}  Appellant's second argument is that the two loans that were taken out to pay appellant's 1999 income taxes should have been treated as marital debt rather than appellant's separate debt.  Appellant testified that he borrowed $40,000 from Batra Cardiology and Associates in June 2000.  Appellant also borrowed $9,000 from A.G. Edwards, Inc., in April 2000.  Appellant argues that these loans were used to pay taxes arising out of the advances made by EORH as described in the analysis of assignment of error number three.  EORH

had advanced $453,000 to appellant between 1995 and 1999. Part of the advance was scheduled to be forgiven, and a much smaller part was due to be repaid.

{¶ 68} Appellant argues that the tax consequences of the EORH loans benefited both himself and appellee. Appellant then leaps to the conclusion that both he and appellee should be jointly responsible for repaying $49,000 in loans that were supposedly used to pay his 1999 income taxes. Appellant's conclusion is not logical and is not persuasive.

{¶ 69} Although there were undoubtedly tax consequences arising out of the way that EORH paid appellant for his services, those consequences have no bearing on the trial court's decision. First, there was very little evidence presented about the $49,000 loans. The trial court may simply not have believed appellant's arguments about the reason for borrowing the money or may not have even believed that the money was borrowed. The credibility of witnesses and the relative weight of each piece of evidence is left to the discretion of the trier of fact. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 70} Second, if the loans actually took place, they occurred after divorce proceedings were initiated. There is no evidence that appellant consulted appellee in taking out the loans. Appellant's 1999 income tax returns are not part of the evidence, so there is no verification that he owed $49,000 in taxes. The trial court appears to have reasoned that appellant intentionally manipulated his income and financial relations with EORH to create a massive tax consequence at the end of the 1999 tax year. In essence, the court concluded that appellant dissipated marital assets by creating a $49,000 debt after the divorce proceedings had begun. The parties in a divorce action are not permitted to dissipate assets during the marriage or during the divorce proceedings: "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation * * * of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(3). In effect, the court awarded appellee a greater share of marital property by making appellant solely responsible for the $49,000 debt.

{¶ 71} Third, the evidence revealed that appellant negotiated a deal with EORH to repay the hospital $100,000 in 1999, while, at the same time, receiving significant loan forgiveness in 1999. This loan forgiveness was treated as taxable income for appellant. Appellee does not appear to have been consulted in this process. Appellant may have been able to arrange for more favorable cash-flow consequences when he negotiated with EORH for the loan repayments and loan forgiveness schedule. It appears that appellant had $100,000 to work with in 1999 and that he chose to give the $100,000 to EORH to repay part of his loans rather than use it to pay his taxes. Again, the record can easily be read to

support a conclusion that appellant created this cash-flow problem himself (resulting in appellant's having to borrow money to pay his taxes), and the trial court held appellant accountable for the result.

### 3. Loans to appellant's sister.

{¶ 72} Appellant argues that the manifest weight of the evidence supports a conclusion that the parties' jointly owed appellant's sister, Kanika Sharma, $8,000. Appellant and Sharma both testified that there were two loans totaling $8,000 that had not yet been repaid. Appellee, on the other hand, testified that she was not aware of any loans to Sharma:

{¶ 73} "Q. [Appellee's attorney] There has been some testimony today about money borrowed by Naba [Appellant] from his sister. Do you have any knowledge of that?

{¶ 74} "A. [Appellee] No.

{¶ 75} "Q. Did you * * * sign any papers?

{¶ 76} "A. No, I never signed any papers."

{¶ 77} The trial court may have believed appellee's testimony relating to the alleged loans. The credibility of witnesses and the relative weight of each piece of evidence are left to the discretion of the trier of fact. *Seasons Coal Co.*, 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 78} In conclusion, appellant's first assignment of error is sustained. There is no evidence in the record supporting that marital funds were used to purchase the Ramsai Hill property and the trial court erred in finding that the Ramsai Hill property was marital property. The record supports the trial court's decision with respect to the $49,000 and $8,000 loans. Appellant's eighth assignment of error is hereby overruled.

### 3. ALLOCATION OF SPECIFIC ASSETS DUE TO MISCONDUCT

#### a. ASSIGNMENT OF ERROR NO. 4

{¶ 79} Appellant's fourth assignment of error asserts:

{¶ 80} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence in determining the valuation and allocation of the parties' investment in ORC power."

{¶ 81} Appellant argues that any investment the parties had in a company known as ORC Power had no value, because all the evidence presented at trial indicated that the company itself had no value. Appellant argues that he and appellee each deducted half of a $9,000 investment in ORC Power as a loss on their 1998 and 1999 income tax returns. Appellant concludes that an investment

that has no value should not be treated as a marital asset, or if it is an asset, should have been allocated equally to both parties.

{¶ 82}   The record indicates that the parties had some type of investment or interest in ORC Power.  Appellant's brother Anil was primarily in charge of the company.   In 1998 or 1999, Anil asked appellant to reimburse him for $9,000 worth of expenditures he had made for the company.  Appellant did not have any funds to give to Anil, so he decided to used his American Express card and purchase $9,000 worth of computer equipment to send to Anil. Appellant paid the American Express bill with income he received from EORH.

{¶ 83}   The issue before the court was whether appellant should be responsible for the $9,000 expenditure.

{¶ 84}   The parties in a divorce action are not permitted to dissipate assets during the marriage or during the divorce proceedings: "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation * * * of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."   R.C. 3105.171(E)(3).

{¶ 85}   The record supports the conclusion that appellant, on his own, spent $9,000 of marital funds to purchase computers, which he then sent to his brother Anil in India.   Ostensibly, this expenditure was for the benefit of a company called ORC Power.   The trial court may have believed appellant's testimony about the expenditure but not about the reason for the expenditure. In other words, the trial court may have concluded that there was no legitimate marital debt of $9,000 to justify the $9,000 expenditure.  The trial court may have concluded that appellant dissipated $9,000 of marital funds.  If appellant dissipated marital assets, the trial court had the discretion to award appellee an additional $9,000 in marital assets or deduct $9,000 from appellant's assets.  The trial court achieved this result by assigning a value to the ORC Power investment, and awarding the investment to appellant.   The trial court was actually doing appellant a favor, because he will be able to claim any residual value in the ORC Power investment, whereas the court could have simply deducted $9,000 from his share of the marital assets without mentioning ORC Power.

{¶ 86}   The record supports a finding that appellant dissipated $9,000 worth of marital assets and supports the trial court's decision to attribute those assets to appellant.   The fourth assignment of error is overruled.

b.   ASSIGNMENT OF ERROR NO. 5

{¶ 87}   Appellant's fifth assignment of error asserts:

{¶ 88}   "The trial court erred in the allocation of the mortgage payments on the real estate located in the United States."

{¶ 89} This error deals with an adjustment of $10,100 in appellee's favor arising out appellee's overpayment of mortgage payments. On February 14, 2000, the magistrate ordered both parties to pay one half of the mortgage payments on their real estate located in Belmont County. Appellant argues that the record does not support that appellee overpaid her portion of the mortgage payments. Appellant argues that Defendant's Exhibit 21, which was the basis of appellee's claim of overpayment, does not show any overpayment. This error requires an examination of the numbers listed on Defendant's Exhibit 21 to see whether they indicate any overpayment.

{¶ 90} Defendant's Exhibit 21 consists of a series of bank statements from February 1, 2000, to February 28, 2001. Each monthly statement contains the records of two accounts. The first account is a checking account ("Mortgage Checking Account"), primarily used to pay the two mortgages on two properties in Belmont County. The first mortgage was for the marital residence at 111 Lexington Drive, St. Clairsville, Ohio. A mortgage payment of $887.83 was due on this property every two weeks, according to Defendant's Exhibit 21. The second mortgage was for five acres of vacant ground in Richland Township, Belmont County. This mortgage payment was due once per month, and varied between $687.76 and $710.40 per month. The record does not contain a total for the mortgage payments that were due during the time period covered by Defendant's Exhibit 21. Using the figures in Defendant's Exhibit 21, the total amount of the mortgage charges on both properties from February 14, 2000 (the date of the court's order), through February 28, 2001, appears to have been $32,057.33. Each party would have been responsible for one half of this amount, or $16,028.66.

{¶ 91} Defendant's Exhibit 21 also includes information about a related account ("Cash Reserve Account"), which was basically a floating line of credit that was used to cover up to $2,000 in overdraws in the parties' Mortgage Checking Account.

{¶ 92} Appellee told the court what to look for in Defendant's Exhibit 21:

{¶ 93} "Q. [Appellee's Attorney] Now, you have written on these records. Can you please tell the judge what you have done to identify the money that you have put into this account.

{¶ 94} "A. [Appellee] Yes. Where it's marked deposit, I wrote that I had—I circled it and said that that was mine, put a checkmark against it."

{¶ 95} The parties' obligation each to pay half of the mortgage payments began on February 14, 2000, the date of the court's order. Taking into account only the deposits which occurred after February 14, 2000, there are 11 deposit entries that are both circled and checked with a checkmark, and these

total $14,483.13. There is a deposit on April 24, 2000, for $1,600, which only has a checkmark. If this is included, appellee's payments total $16,083.13. There are three deposits that are only circled but have no checkmark: November 20, 2000, for $3,000; January 3, 2001, for $1,300; and February 27, 2001, for $1,300. These additional deposits total $5,600. The total of all deposits that have a checkmark, circle, or both, is $21,683.13.

{¶ 96} The magistrate's report determined that appellee had paid $14,400 toward appellant's share of the mortgage payments, and referred to Defendant's Exhibit 21. The magistrate did not explain how he arrived at this value.

{¶ 97} On June 12, 2001, Magistrate White filed a letter explaining that he had incorrectly attributed a $3,000 and a $1,300 deposit to appellee, and that the actual amount of appellee's overpayment was $10,100. The trial court incorporated the $10,100 overpayment as part of the divorce decree, and ordered appellant to reimburse appellee for the overpayment.

{¶ 98} It is impossible to tell how the magistrate and the trial court arrived at the $10,100 amount of overpayment. No combination of the numbers listed on Defendant's Exhibit 21 results in a $10,100 overpayment. Using the items that were marked with a checkmark on Defendant's Exhibit 21, it appears that appellant deposited almost exactly the amount she owed in mortgage payments ($16,083.13 in deposits versus $16,028.66 owed). There are additional notations on Defendant's Exhibit 21 that the trial court may have relied upon, but the June 12, 2001 letter from Magistrate White tends to indicate that he was relying only on the deposit entries that appellee had specifically marked with a checkmark. As there is not enough information in the record to review how the trial court arrived at $10,100, we must reverse this aspect of the judgment and remand the issue to the trial court for a recalculation of the alleged overpayment and an explanation of how the result was reached.

{¶ 99} Appellant also tries to use Defendant's Exhibit 21 to prove that he overpaid his share of the mortgage payments. Appellant did not make this argument at the April 9, 2001 magistrate's hearing. In his objections to the magistrate's report, he included what he considered to be a corrected version of Defendant's Exhibit 21. He argued that all deposits not specifically check-marked by appellee should have been treated as his deposits. This argument is patently incorrect. Many of the deposits to the Mortgage Checking Account that appellant's claims as his own were merely transfers from the Cash Reserve Account.

{¶ 100} Furthermore, appellant's modified version of Defendant's Exhibit 21 was not evidence, but, rather, an attempt to introduce new evidence. Under Civ.R. 53(E)(4)(b), a trial court may, but is not required to, hold a new

hearing and take new evidence when a party objects to the magistrate's factual findings. *Kubin v. Kubin* (2000), 140 Ohio App.3d 367, 371, 747 N.E.2d 851. Given that appellant had ample opportunity to challenge or rebut Defendant's Exhibit 21 at the April 9, 2001 magistrate's hearing, but did not rebut the exhibit, the trial court understandably ignored appellant's attempt to change the evidence that was presented at the hearing.

{¶ 101} Appellant, by filing his modified version of Defendant's Exhibit 21, essentially admitted that appellee deposited $16,083.13 to the Mortgage Checking Account between February 14, 2000, and February 28, 2001. He highlighted appellee's payments in blue magic marker, and the total of those deposits, in the relevant time period, amounts to $16,083.13. Appellant's own document does not support his assertion that appellee underpaid her share of the mortgages.

### c. ASSIGNMENT OF ERROR NO. 6

{¶ 102} Appellant's sixth assignment of error asserts:

{¶ 103} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence in determining the valuation and allocation of the New York Life Insurance policies on the parties' children."

{¶ 104} The trial court placed a value of $4,000 on two life insurance policies that had been whole life policies but which had converted to term insurance (with no cash value) during the pendency of the divorce. Appellant argues that these policies should not be given a value or should be allocated to appellee. Appellant argues that appellee was the party responsible for the policies' being converted to term insurance with no cash value.

{¶ 105} A life insurance policy that has a cash value is an asset, and if the cash value was generated by using marital funds (or otherwise is attributable to the marriage), the cash value is a marital asset. *Jelen v. Jelen* (1993), 86 Ohio App.3d 199, 203, 620 N.E.2d 224; *Frost v. Frost* (1992), 84 Ohio App.3d 699, 713, 618 N.E.2d 198; *Babka v. Babka* (1992), 83 Ohio App.3d 428, 433, 615 N.E.2d 247.

{¶ 106} The parties in a divorce action are not permitted to dissipate assets during the marriage or during the divorce proceedings: "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation * * * of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(3).

{¶ 107} The record indicates that the monthly premiums for the two policies totaled $510.00, and that this amount was automatically withdrawn from the same joint checking account that was used to pay the mortgages on the real estate located in Belmont County. The record indicates that there were insufficient funds in the checking account to cover the insurance premiums due in

October 2000. The record indicates that appellant owned the policies. The record shows that the policies lapsed on October 11, 2000. The record contains letters from the insurance company stating that the policies were converted to term life policies, and that the accumulated cash value was applied to pay the premiums pursuant to the terms of the policy.

{¶ 108} There is evidence to support that the insurance policies had a cash value of approximately $4,000 at the time the policies lapsed. Appellant does not point to anything in the record indicating that appellee had any duty to pay all or part of the premiums. The court did not order appellee to pay for any portion of the premiums to maintain the life insurance policies. There is no clear indication in the record indicating the names of the beneficiaries of the policies, although appellant did testify that the beneficiaries were "Sarah [appellee] and I as far as I know." Regardless of who was then named as beneficiaries of the policies, appellant owned the policies. It would have been his ultimate responsibility either to liquidate the policies or pay the premiums, and it was appellant who had the authority to designate who the beneficiaries would be. Because appellant did not deposit sufficient funds in the parties' joint checking account to cover the October 2000 premiums, the policies lapsed. Once the policies lapsed and were converted to term life insurance, they no longer had a cash value. Appellant apparently did not make any effort either to pay the premiums or receive the cash value. Thus, the record supports the conclusion that appellant caused the dissipation of the $4,000 asset. The trial court was within its discretion to assign a value to the insurance policies and to allocate the entire value to appellant as the party responsible for the dissipation of the asset.

{¶ 109} For these reasons, appellant's sixth assignment of error is overruled.

### d. ASSIGNMENT OF ERROR NO. 7

{¶ 110} Appellant's seventh assignment of error asserts:

{¶ 111} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence in determining the valuation and allocation of the American Express and Delta Air miles."

{¶ 112} Appellant contends that there was no evidence, other than appellee's testimony, that appellant prevented appellee from using $10,000 worth of air travel credits which appellee earned from using an American Express credit card. Appellee rebuts this by pointing to her own testimony at trial that appellant changed appellee's American Express account to his own account, thereby preventing appellee from accessing the air travel credits. Appellant did not rebut this testimony. The testimony of a single witness may be sufficient to establish the monetary value of an object. *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 628, 605 N.E.2d 936. There being no

other testimony on the subject, the trial court was free to believe appellee's testimony. Appellant's seventh assignment of error is overruled.

## 4. THE OVERALL DIVISION OF MARITAL ASSETS.

### a. ASSIGNMENT OF ERROR NO. 9

{¶ 113} Appellant's ninth assignment of error asserts:

{¶ 114} "The trial court abused its discretion, committed reversible error and ruled against the manifest weight of the evidence when dividing the parties' assets."

{¶ 115} This assignment of error deals with the general division of marital assets. A trial court's division of marital property is reviewed for abuse of discretion. *Martin v. Martin* (1985), 18 Ohio St.3d 292, 294–295, 18 OBR 342, 480 N.E.2d 1112. An abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. This court should not substitute its judgment for that of the trial court unless, after considering the totality of the circumstances, it determines that the trial court abused its discretion. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 131, 541 N.E.2d 597.

{¶ 116} A reviewing court "should not review discrete aspects of the property division out of context of the entire award." *Baker v. Baker* (1992), 83 Ohio App.3d 700, 702, 615 N.E.2d 699. "The appropriate consideration is whether the trial court's disposition of these items resulted in a property division, which, viewed in its entirety, was an abuse of discretion." *Briganti v. Briganti* (1984), 9 Ohio St.3d 220, 222, 9 OBR 529, 459 N.E.2d 896.

{¶ 117} A potentially equal division of marital assets is the preferred starting point from which to obtain an equitable result. *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, 355, 20 O.O.3d 318, 421 N.E.2d 1293. The trial court may make any division of marital assets that it deems equitable, as long as it considers the factors listed in R.C. 3105.171(F)(1) through (9). The mere fact that a division of marital property is unequal, standing alone, does not constitute an abuse of discretion. Id., 66 Ohio St.2d at 353, 20 O.O.3d 318, 421 N.E.2d 1293.

### 1. The Wesbanco account.

{¶ 118} Appellant is correct that the court failed to allocate approximately $6,000 held in a bank account identified as the "Wesbanco" account. Schedule 1 of the decree identifies the account as having $12,580. Schedule 2 of the decree awards each party $3,300 of the account. The remaining balance should be distributed or accounted for in the trial court's decision. Therefore, we sustain appellant's ninth assignment of error with respect to the Wesbanco account.

2. The $85,000 distributive award to be paid over five years.

{¶ 119} The trial court awarded approximately $85,000 more of the marital assets to appellee, and then ordered appellee to pay appellant $85,000 over five years to equalize the division of assets. Appellant argues that the court should not have allowed appellee to take five years to make the payments, and at least should have ordered appellee to pay interest on the unpaid balance each year.

{¶ 120} R.C. 3105.171(A)(1) states:

{¶ 121} " 'Distributive award' means any payment or payments, in real or personal property, that are *payable in a lump sum or over time*, in fixed amounts, that are made from separate property or income, and that are not made from marital property and do not constitute payments of spousal support * * *." (Emphasis added.)

{¶ 122} R.C. 3105.171(E) states:

{¶ 123} "(1) *The court may make a distributive award to facilitate, effectuate, or supplement a division of marital property.* The court may require any distributive award to be secured by a lien on the payor's specific marital property or separate property.

{¶ 124} "(2) *The court may make a distributive award in lieu of a division of marital property* in order to achieve equity between the spouses, if the court determines that a division of the marital property in kind or in money would be impractical or burdensome." (Emphasis added.)

{¶ 125} R.C. 3105.171 gives the trial court the power to order distributive awards to be paid over a period of time as part of its equitable powers in a divorce action. In the instant case, the trial court ordered the distributive award to achieve equity due to an inequitable division of assets in kind. This falls under section (2) of R.C. 3105.171(E).

■ {¶ 126} There is nothing in R.C. 3105.171 that would prohibit the trial court from ordering a distributive award over a period of years. Therefore, there is no error per se in the court's ordering payments to be spread out over five years.

{¶ 127} Appellant is mainly concerned that the trial court did not consider that $85,000 paid over five years was worth considerably less than $85,000 paid in one lump sum due to the time value of the money. In other words, appellant would lose the interest that could have been earned on the amount of the $85,000 still owed at the end of each year.

{¶ 128} Appellant is incorrect that the trial court failed to consider the time value of the $85,000 payments. The decree specifically states that the payments shall be made without interest. The decree states that the debt will be a lien on

the Lexington Drive property. The decree specifically mentions that the debt shall be reduced to present value if appellee sells the Lexington Drive property. The court even includes the formula to be used in establishing present value. Therefore, the court was well aware that the $85,000 payments were worth less than $85,000 if reduced to present value.

{¶ 129} Strangely, though, the trial court used the $85,000 figure in dividing the marital assets, instead of using the present value of $85,000. Using the $85,000 figure, the court may have thought it was dividing the assets more or less evenly, granting appellant $662,525 and appellee $665,775. The division was not necessarily equal, though, because the present value of the $85,000 payments would be worth considerably less than $85,000. Appellee would have had to transfer considerably less than $85,000 to appellant, making her ultimate share of the marital assets much higher. The trial court is required to explain its decision in enough detail for a reviewing court to determine whether the result is fair and equitable. *Clark v. Lintner–Clark* (June 30, 2000), 7th Dist. No. 720, 2000 WL 875364. The trial court did not explain why it made an unequal division of the marital assets, if an unequal division was the court's intent. On the other hand, if the court intended to divide the assets evenly, the method the court used did not create an equal division of the assets. Either way, this aspect of the case must be remanded for an explanation from the trial court.

{¶ 130} Based on our rulings on assignments of error 1, 5, and the error relating to the Wesbanco account, it is unlikely that any distributive award will equal $85,000. If the trial court does order a distributive award over a period of years, it should do so in a manner consistent with this opinion, taking into account the present value of the distributive award.

## C. CONCLUSIONS

{¶ 131} The following aspects of the divorce decree are hereby reversed and remanded for further consideration:

{¶ 132} 1. The Ramsai Hill property is not marital property, and the trial court must reconsider the division of marital assets based on the removal of the Ramsai Hill property from the asset list. (Assignment of Error No. 1 sustained.)

{¶ 133} 2. The trial court must recalculate the alleged overpayments by appellee on the parties' Belmont County mortgage payments, and must explain its calculation in sufficient detail to allow for a review of the calculation. (Assignment of Error No. 5 sustained in part.)

{¶ 134} 3. The trial court must allocate the entire Wesbanco account between the parties. (Assignment of Error No. 9 sustained in part.)

{¶ 135}   4. The $85,000 distributive award is reversed, and the final division of marital assets and debts is remanded for further consideration in light of this opinion.  If the trial court concludes that a distributive award is in order, and orders it to be paid over a number of years, the court must adjust for the present value of the award and explain whether an unequal division is the court's intent. (Assignment of Error No. 9 sustained in part.)

{¶ 136}   All remaining assignments of error are overruled.

Judgment accordingly.

GENE DONOFRIO and VUKOVICH, JJ., concur.