DECISION.
{¶ 1} Defendant-appellant John Metz appeals from various aspects of the decree of divorce entered by the Hamilton County domestic relations court. He raises eleven assignments of error for our review. For the reasons set forth below, we affirm the trial court's judgment.
 Procedural and Factual History {¶ 2} John and plaintiff-appellee Sandra Metz were married in October 1981. During the marriage, John earned his living as a personal-injury and medical-malpractice attorney. Sandra was a secretary until 1989, when their second child was born. At the time, the parties agreed that she would stay at home and care for the children. Three children were born during the marriage: Kaitlin, now emancipated, Michelle, born July 2, 1989, and Eric, born August 15, 1991.
 {¶ 3} For the next eleven years, Sandra did not work outside the home. In 2000, when all three children were in school full time, she took a job as a part-time receptionist. Sandra was primarily responsible for raising the couple's children, as John was engaged in a demanding law practice. She specifically chose employment that only took her out of the home a few hours a day, so that she could be available for the children and their schedules.
 {¶ 4} In September 2001, John and Sandra physically separated. At that time, negotiations began regarding a possible divorce settlement. When the negotiations failed to produce a settlement, Sandra filed for divorce in July 2002. During the divorce proceedings, John was consistently late in providing discovery, citing his poor organizational skills and lack of recordkeeping for the delays in providing Sandra with financial information.
 {¶ 5} The property hearings took place over six days: July 30, November 17, 24, and 25, 2003, and March 1 and 3, 2004. John did not file his property statement until November 21, 2003, nearly four months after the property hearings had begun. At the time of the final hearing, John had still not completed his taxes for 2003.
 {¶ 6} John and Sandra stipulated to their earnings for the years 1999 through 2001 as reflected on their joint tax returns: in 1999, John earned $1,588,520 and Sandra earned nothing; in 2000, John earned $621,056 and Sandra earned $4,751; in 2001, John earned $1,188,545 and Sandra earned 11,220. In 2002, John's income was $450,310 and Sandra's was $11,220.
 {¶ 7} Following the property hearings, the parties each submitted written closing arguments in excess of 60 pages. A magistrate's decision addressing all the property and support issues was entered in June 2004. The 18-page decision contained 12 pages of findings of fact. Later that same month, the magistrate issued a supplemental decision "correcting mathematical and typographical errors." John submitted 35 objections to the magistrate's decision, while Sandra filed three objections. The trial court overruled all but one of John's objections and all of Sandra's objections.
 {¶ 8} On September 28, 2004, while the parties were awaiting a decision on their objections, John filed a motion to modify spousal support. When the decree of divorce was entered on May 28, 2005, it reflected the trial court's determination that the issue of the modification of spousal support would be determined following the entry of the decree of divorce and would be retroactive to the filing date of the motion. On June 1, 2005, the trial court issued a decision significantly reducing spousal support based upon John's financial circumstances in 2004. Neither party, however, objected to the substance of that decision.
 Marriage Termination Date {¶ 9} In his first assignment of error, John argues that the trial court erred in finding that the marriage terminated on July 30, 2003. John claims that the marriage terminated in December 2001, when Sandra moved out of the marital residence and the parties separated.
 {¶ 10} R.C. 3105.71(A)(2)(a) defines "during the marriage" to mean that period of time from the date of the marriage through the final hearing in an action for divorce or legal separation. In Hamilton County, this is generally understood to be the date of the first property hearing, as the final hearing, typically called the merits hearing, is often considerably later. Thus, there is a statutory presumption that the period for the acquisition of marital property falls between the date of the formal marriage and the termination date of the marriage, unless the trial court determines that other dates are equitable.[1]
 {¶ 11} In this case, the trial court found that "during the marriage" included the period from October 17, 1981, through July 30, 2003, the date of the first property hearing, pursuant to R.C. 3105.17(A)(2)(a). In overruling John's objections to the magistrate's decision, the trial court stated that its "use of the July 30, 2003, date was reflected in, but not limited to the following findings: (1) the parties married on October 17, 1981 and resided together for a period of almost twenty years during which time they had three children; (2) husband has been the primary wage earner; (3) Wife left the workforce in 1989 to be a stay-at-home mom resulting in significant lost income production capacity; (4) following their separation, the parties continued to discuss financial matters agreeing to the use of joint bank account for payment of joint expenses, consistent with their practice prior to separation, as well as for the payment of their individual expenses; (5) the parties filed joint tax returns for 2001 and 2002, agreeing that a tax overpayment for tax year 2002 would be applied to their 2003 tax liability; and (6) husband has the greater earning ability." Thus, the trial court concluded that it was not inequitable, based on the facts and circumstances of this case, to find that the parties' marriage had terminated on July 30, 2003, for purposes of determining what constituted marital property.
 {¶ 12} Given our review of the record, we cannot say that the trial court abused its discretion in utilizing the statutory date as the date of the end of the marriage, instead of the de facto marriage termination date. The trial court carefully considered the facts that would have permitted its adoption of December 2001 as the time the marriage had ended.[2] As its decision exhibited a sound reasoning process, the statutorily defined date was appropriate.[3] The first assignment of error is overruled.
 John's Contingency Fees in 2002 and 2003 {¶ 13} In his second assignment of error, John argues that the trial court erred in finding that all the contingency fees he had earned during 2002 and 2003 were marital property and dividing them equally between him and Sandra.
 {¶ 14} Once the trial court held that "during the marriage" meant the date of the marriage until July 30, 2003, there was a presumption that all assets as of the latter date would be considered marital. R.C.3105.171(A)(3)(a)(1) defines marital property as "all real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both the spouses during the marriage." Marital property includes "income and appreciation on separate property, due to the labor, monetary or in-kind contributions of either or both spouses that occurred during the marriage."[4]
Moreover, income generated from a law practice can be construed as a marital asset if it was accumulated over the period of the marriage.[5]
 {¶ 15} The record reveals that John had approximately 39 cases pending in state and federal courts, approximately 11 of which were medical-malpractice cases. John began work on the oldest of those cases, the Brotherton case, in 1989. The trial court found that given the nature of his work and the significant amount of time routinely invested (typically six to twelve years) before his cases yielded any income, all earnings generated by John during 2002 and 2003 were marital in nature.
 {¶ 16} Central to the trial court's decision was its determination that Sandra had made a significant contribution to the marriage by staying at home and caring for the parties' children, thus allowing John to devote long hours to his law practice and to reach the income level he then enjoyed. Therefore, the trial court concluded that permitting John to claim all the fees earned since the separation would have disregarded Sandra's efforts during the marriage and the particular nature of John's employment.
 {¶ 17} Our review of the record reveals that the trial court had substantial information before it that supported its determination that the fees John had earned in 2002 and 2003 were the result of work that was performed during the marriage. And as the trial court pointed out, John "presented no evidence indicating that any of his taxable income for those years was the result of work performed after the ending date of the marriage."
 {¶ 18} Finally, John argues that the trial court erred in including all the fees he had earned in 2003 when it set the termination date of the marriage as July 30, 2003. But the trial court, to achieve an equitable distribution of property, may utilize alternative valuation dates where it is reasonable under the facts and circumstances of the case.[6] Moreover, the determination of when to apply a valuation date other than the actual date of the divorce is within the trial court's discretion and cannot be disturbed absent an abuse of discretion.[7]
Having reviewed the record, we conclude that, in this case, the trial court properly viewed all the income in 2003 as marital given the derivation of that income. As a result, we overrule John's second assignment of error.
 Brotherton Fee {¶ 19} In his third assignment of error, John argues that the trial court erred by treating the unpaid portion of the Brotherton legal fees as marital property subject to equal division.
 {¶ 20} John's work in Brotherton v. Cleveland, a class-action lawsuit in federal court, began in 1989 and essentially concluded in 2001. John was awarded fees slightly in excess of $1 million in that case. The last of the four installments on those fees was expected in 2004, but would not be paid until the plaintiffs in the case had been fully compensated. The trial court determined that John's work on the Brotherton case was completed during the marriage. The trial court held that because the fees were earned in 2001, but were not distributed until a later time, the unpaid portion of those fees, in the amount of $117,600 plus interest, was essentially an account receivable and therefore subject to equal division as a marital asset.
 {¶ 21} John argues that the trial court erred in treating the fees as a marital asset, instead of income, and that the cost of doing business should have been deducted from the Brotherton fee. But as the trial court pointed out, "the unpaid portion of the fee[s] was neither liquid nor contigent. As such, the characterization of the fee[s] as an account receivable and[,] therefore, a marital asset [wa]s appropriate." Furthermore, the record reveals that the business expenses associated with the fees were incurred prior to 2001, that Sandra had shared in those expenses, and that John presented no evidence that he had any further expenses related to the collection of the fees.
 {¶ 22} Consequently, we cannot conclude that the trial court abused its discretion in treating the fees as a marital asset and in determining that Sandra had already shared in any expenses generated by the fees. Moreover, the trial court's decision took into account that John had already paid taxes on the fees, by characterizing the payment as class II spousal support, which made the payment deductible by John and income to Sandra. As a result, we overrule the third assignment of error.
 Calculation of Social Security Benefits {¶ 23} In his fourth assignment of error, John argues that the trial court erred in its consideration of the parties' future social-security benefits.
 {¶ 24} In Neville v. Neville, the Ohio Supreme Court held that "in making an equitable distribution of property in a divorce proceeding, a trial court may consider the parties' future social security benefits in relation to all marital assets."[8] The Ohio Supreme Court, however, did not define what the term "social security benefits" actually means.
 {¶ 25} John argues that the trial court should have accepted the coattail-and-widow's-benefits valuation proffered by his expert, David Kelley. But Kelley testified that the use of the "widow's benefit/coat-tail projection" introduced another level of speculation that made some experts question its efficacy. Kelley admitted that he had come up with the term "coattail" after the Neville decision, that the concept was his own formulation, and that, to his knowledge, no court had adopted this method of valuation.
 {¶ 26} In its decision on the objections, the trial court "recognized the complexities attendant to a valuation of Social Security benefits and the assumptions necessary to the process." The court stated that "this of course, shrouds the issue with some uncertainty and a fair measure of speculation." Consequently, the trial court "decline[d] the opportunity to add yet another ingredient of speculation to the mix, i.e.[,] the coat-tail effect." The court reasoned that "while it could be argued that the Social Security Administration's use of `coat-tail' calculations to develop their future actuarial funding assumptions is a prudent approach, application to the valuation of social security benefits for the purpose of determining an equitable division of property expands the envelope of speculation beyond that which is reasonable and appropriate in the case at bar."
 {¶ 27} Here, the trial court was presented with two expert opinions on the valuation of the parties' social-security benefits. The credibility and weight of their testimony were primarily for the trial court to determine.[9] Because the record supports the trial court's reasoning for rejecting the coattail-and-survivorship calculations in the social-security valuations, we cannot conclude that the trial court abused its discretion. We, therefore, overrule the fourth assignment of error.
 Treatment of Social Security Benefits {¶ 28} In his fifth assignment of error, John argues that the trial court erred by treating the parties social-security benefits as an item of marital property subject to marital division.
 {¶ 29} In Neville, the Ohio Supreme Court discussed social-security benefits as a factor in dividing property. The court held that retirement benefits accumulated during the marriage are marital property subject to division.[10] But the court acknowledged that the benefits themselves cannot be physically divided between the parties due to provisions of federal law.[11] The court then discussed several approaches for considering the benefits in dividing property and concluded that the most reasoned approach permits the trial court to utilize its discretion to offset the benefits against any marital property, not only against defined-benefit plans or other retirement plans.[12] The court upheld the trial court's adoption of a magistrate's recommendation that the wife be awarded equity in the marital residence, "explicitly balancing its value against [the husband's] social security benefits."[13]
 {¶ 30} Following Neville, several appellate courts have included social security as a relevant factor in the division of marital assets.[14] In Pruitt v. Pruitt, for example, the Eighth Appellate District concluded that the trial court's inclusion of "each party's Social Security benefits in its listing of their portion of the property division, did not amount to a division of their Social Security benefits."[15] Rather, the court concluded that "the effect of the trial court's consideration of the valuation of each party's anticipated benefits was to offset the Wife's lower Social Security benefits against the other property of the marriage, which fell within Neville's
guidelines."[16] Likewise, in McConnell v. McConnell, the court expressly awarded the wife a business interest in exchange for the disparity in the social-security values.[17] While the award was not appealed, it was described by the court in its analysis of another issue as follows:
 {¶ 31} "The Court has considered Joint Exhibit I and Plaintiff's Exhibit 17 and finds that, after examination of the valued Social Security benefits to be received by Plaintiff, $159,406.79 and by Defendant, $148,180.00 in light of Neville v. Neville,99 Ohio St.3d 275, 2003-Ohio-3624, the Court has made up for and exceeded the difference in value by setting off the MPI Real Estate asset to Defendant, infra, thereby providing for an equal distribution of assets."[18]
 {¶ 32} We have reviewed the record in this case and conclude that the magistrate and the trial court properly considered John and Sandra's social-security benefits in distributing their marital assets in accordance with the decision in Neville. The magistrate and the trial court included the value of John and Sandra's social-security benefits in its listing of their portions of the property division, offset the value of Sandra's lower benefits against other marital property, and then ordered John to transfer one-half of that difference to Sandra from other marital assets. Consequently, we find no abuse of discretion. We, therefore, overrule the fifth assignment of error.
 Spousal Support {¶ 33} In his sixth assignment of error, John argues that the trial court erred by awarding spousal support in a fixed monthly amount.
 {¶ 34} R.C. 3105.18(C) provides that the court may award spousal support as is "appropriate and reasonable." In making its determination, the trial court must consider the factors set forth in R.C.3105.18(C)(1). Moreover, the trial court has broad discretion in determining the amount and duration of an award of spousal support.[19]
 {¶ 35} In this case, the trial court ordered John to pay Sandra spousal support, effective July 1, 2004, in the monthly amount of $9,000 for a period of 72 months. John argues that because his income varied unpredictably and because there have been changes in Ohio law that will negatively affect medical-malpractice litigation, the trial court's decision forcing him to make regular monthly payments of spousal support was neither reasonable nor appropriate. He contends that the trial court abused its discretion when it rejected the testimony of two medical-malpractice attorneys on the bleak future of medical-malpractice litigation for the Ohio plaintiffs' bar in light of recently enacted legislation capping the damages recoverable in such cases.
 {¶ 36} The magistrate noted that the two malpractice attorneys were "not expert witnesses on the issue of the future of medical malpractice litigation in light of the new [Ohio] statute." The magistrate further stated that "neither [attorney] had reviewed [John]'s files and neither could provide any information about the value of his cases."
 {¶ 37} The record supports this conclusion. Both attorneys provided the court with only anecdotal evidence of how difficult it was to win a medical-malpractice verdict. Moreover, one of the attorneys testified on cross-examination that it had always been difficult for plaintiffs to win verdicts in this jurisdiction, but that a plaintiff's attorney had in 2003 won a medical-malpractice verdict in the amount of $3.5 million against a hospital in Hamilton County, and that another medical-malpractice verdict had been reported in the amount of $1,525,000 in Hamilton County during 2003. The evidence also revealed that John had established himself as a highly successful practitioner in this area of law despite the odds against him.
 {¶ 38} As the magistrate further noted, "Although husband has not chosen to file a medical malpractice case since the new statute's enactment, several of his respected colleagues have filed cases. Medical malpractice continues to be viable. As was shown by his trial schedule, husband has a significant number of cases pending. In 1975, 1987, and 1999, attempts to cap medical malpractice cases were determined to be unconstitutional. It will take years to experience the impact, if any, of the medical malpractice verdict limitations if the limitations are determined to be constitutional." Thus, the magistrate concluded that any reduction in John's future earnings was purely speculative.
 {¶ 39} Moreover, the decision to award spousal support in a fixed monthly amount was also based on the magistrate's determination to disentangle the parties financially. There was significant testimony about John's lack of recordkeeping and inattention to financial details, including the fact that he had regularly lost or misplaced fee checks, and that he could manipulate his income by choosing when to claim it. A percentage approach would have directly placed Sandra at the mercy of John's record-keeping on a yearly basis and would have created more litigation between the parties.
 {¶ 40} Furthermore, the trial court directly addressed John's concerns about the fluctuation of his income when it retained jurisdiction over spousal support in the divorce decree. John filed a motion to modify spousal support prior to the final decree. The decree provided that any modification in spousal support would be determined after the entry of the divorce decree and would be retroactive to the date of his motion. The trial court subsequently granted John's motion to reduce his spousal support based on his circumstances at the time, significantly reducing his spousal-support obligation.
 {¶ 41} Because the trial court considered the factors under R.C.3105.18 in awarding spousal support and had a sound reasoning process for ordering that the spousal support be paid in a fixed monthly amount that was supported by the record, we cannot say that it abused its discretion. Consequently, we overrule the sixth assignment of error.
 Attorney Fees {¶ 42} In his seventh assignment of error, John argues that the trial court erred by ordering him to pay $5,000 of Sandra's legal fees. He contends that because the order was based solely on his failure to provide discovery in a timely manner, and because Civ.R. 37 provides the sole basis for awarding legal fees in a discovery dispute, the trial court erred in awarding the fees.
 {¶ 43} A domestic relations court has the ability to award attorney fees under Civ.R. 37, R.C. 2323.51, or R.C. 3105.18(H). In this case, the trial court did not specifically provide the legal basis for the fees, but, as Sandra contends, the record reveals that the fee award was proper under R.C. 3105.18(H).
 {¶ 44} R.C. 3105.18(H) permits a fee award to a party who would otherwise be "prevented from fully litigating [her] rights and adequately protecting [her] interests, if the party ordered to pay "has the ability" to pay the fees awarded. A trial court's failure to recite the exact language of R.C. 3105.18(H) is not reversible error, if the record sufficiently supports the trial court's determination.[20]
Moreover, an award of attorney fees lies within the sound discretion of the trial court.[21]
 {¶ 45} Ohio courts have also "held that, even if a spouse is financially able to pay attorney fees, the court may award fees if the other spouse used tactics that prolonged the litigation. Although these cases were decided before R.C. 3105.18(H) was in effect, the cases are not contrary to R.C. 3105.18(H) because, when unnecessary attorney fees are incurred due to the conduct of the other spouse, the spouse is `prevented from adequately protecting her interests.'"[22]
 {¶ 46} In this case, the court had information about the parties' marital assets, income, and spousal support. Moreover, there was extensive testimony regarding the difficulties Sandra had in pursuing the case, which the magistrate exhaustingly detailed in the decision that the trial court subsequently adopted. Based upon our review of the record, we cannot conclude that the evidence before the court was insufficient to support the award of attorney fees or that the trial court abused its discretion. We, therefore, overrule the seventh assignment of error.
 Edwards Road Mortgage {¶ 47} In his eighth assignment of error, John argues that the trial court erred in determining that the mortgage balance on the Edwards Road real estate was $257,232 rather than $279,554. Because we have already determined that the trial court did not abuse its discretion in finding the end of the marriage to be July 30, 2003, and because the parties stipulated to the mortgage balance of December 2002, which was closer to the July 2003 date, we cannot say that the trial court abused its discretion in using the lower figure to compute the equity in the Edwards Road property. We, therefore, overrule the eighth assignment of error.
 Office Account {¶ 48} In his ninth assignment of error, John argues that the trial court erred in determining that the marital portion of his office account was $4532. But because John's argument is solely predicated upon the trial court's decision to use July 2003 as the termination date of the marriage, and because we have already held that the trial court did not abuse its discretion in utilizing this date, we overrule his ninth assignment of error.
 2002 Tax Overpayment {¶ 49} In his tenth assignment of error, John argues that the trial court erred by treating a 2002 tax overpayment as marital property. His argument is again based upon the trial court's decision to use July 2003 as the marriage termination date.
 {¶ 50} The trial court determined that the failure to include the overpayment as marital property would have led to a manifestly inequitable result because the fees John had earned during 2002 all stemmed from cases that came into his office years before and from work that was done during the term of the marriage. The record reveals that John chose to overpay his 2002 taxes by taking money from marital accounts. The trial court found that, had he not done so, the money would have remained in the parties' accounts for division.
 {¶ 51} The trial court could have concluded that because the tax overpayment was no different from money deposited in a bank account, it was marital property to be divided between the parties. Consequently, we cannot conclude that the trial court abused its discretion in treating the tax overpayment as marital property to be divided between the parties. We, therefore, overrule the tenth assignment of error.
 Magistrate's Jurisdiction {¶ 52} In his eleventh assignment of error, John argues that "the trial court erred by requiring the property and support matters be tried before a magistrate." He argues that the magistrate lacked jurisdiction to hear and decide the property and support issues under Section 1, Article IV of the Ohio Constitution.
 {¶ 53} Section 1, Article IV provides that "[t]he several judges of the supreme court, of the common pleas, and such other courts as may be created, shall, respectively, have and experience such power and jurisdiction, at chambers, or otherwise, as may be directed by law." Section 5, Article IV further provides that the Ohio Supreme Court has the authority to prescribe rules governing practice and procedure in all courts of the state, and that those rules shall not "abridge, enlarge, or modify any substantive right."
 {¶ 54} Civ.R. 75(A) provides that the rules of civil procedure shall apply in all actions for divorce, annulment, and legal separation, and in all related proceedings. Civ.R. 75(C) states that, in such cases, there shall be no right to a trial by jury and that all issues may be heard either by the court or by a magistrate as the court, on the request of any party or on its own motion, may direct.
 {¶ 55} Civ.R. 53 enables a court to appoint a magistrate to hear issues, as if before the court, in accordance with the civil rules and any applicable statutes. The rule further provides for timely objections to a magistrate's decision and for independent review by the trial court. Civ.R. 53(E) explicitly provides that when reviewing a magistrate's decision, the trial court must conduct a de novo review of the facts and conclusions contained in the magistrate's decision.[23]
The trial court, as the ultimate finder of fact, must make its own factual determinations through an independent analysis of the issues and should not adopt the findings of the magistrate unless the trial court fully agrees with them.[24] Civ.R. 53(E)(4)(b) further provides that the trial court "may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter * * *."
 {¶ 56} Nothing in Civ.R. 75 conflicts with a trial court's duty under Section 1, Article IV of the Ohio Constitution to hear and determine cases. Civ.R. 53 provides that the trial court has the ability to render a de novo decision without seeing the demeanor of the witnesses. If the trial court determines that it needs to hear further evidence, the ability to do so is built into the rule.
 {¶ 57} Furthermore, the record reveals that John was given the opportunity to present his arguments to the magistrate and to file objections with the trial court. The trial court then conducted a de novo review of the magistrate's decision in compliance with the civil rules and Ohio law. Consequently, we cannot conclude that John was denied due process of law when the property and support hearings were conducted before a magistrate, instead of before the trial court. As a result, we overrule his eleventh assignment of error. Having found no merit to any of the eleven assignments of error, we affirm the judgment of the trial.
Judgment affirmed.
SUNDERMANN and HENDON, JJ.
JUDGE RUPERT A. DOAN was a member of the panel, but died before the release of this decision.
[1] R.C. 3105.171(G).
[2] Bowen v. Bowen (1999), 132 Ohio App.3d 616, 630-631,725 N.E.2d 1165.
[3] AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 553 N.E.2d 597.
[4] R.C. 3105.171(A)(3)(a)(i); Simoni v. Simoni (1995),102 Ohio App.3d 628, 639, 657 N.E.2d 800.
[5] Frost v. Frost (1992), 84 Ohio App.3d 699, 712-715,618 N.E.2d 198.
[6] See, e.g., Langer v. Langer (1997), 123 Ohio App.3d 348, 353,704 N.E.2d 275; Berish v. Berish (1982), 69 Ohio St.2d 318,432 N.E.2d 183.
[7] Gullia v. Gullia (1994), 93 Ohio App.3d 653, 666,639 N.E.2d 822.
[8] 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, syllabus
[9] Pruitt v. Pruitt, 8th Dist. No. 84335, 2005-Ohio-4424, at ¶ 6; see, also, Goswami v. Goswami, 152 Ohio App.3d 151, 157, 2003-Ohio-0803,787 N.E.2d 26; Anderson v. Anderson, 147 Ohio App.3d 513,2002-Ohio-1156, 771 N.E.2d 303, at ¶ 74.
[10] Neville, supra, at ¶ 6.
[11] Id. at ¶ 7-8.
[12] Id. at ¶ 8-10.
[13] Id. at ¶ 2 and ¶ 12.
[14] See, e.g., Lawson v. Lawson, 5th Dist. No. 05CA10,2005-Ohio-6565, at ¶ 25, ¶¶ 38-43.
[15] Pruitt, supra, at ¶ 8.
[16] Id.
[17] 3rd Dist. No. 14-03-37, 2004-Ohio-1955, at ¶ 7.
[18] Id.
[19] Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67,554 N.E.2d 83.
[20] Curtis v. Curtis (2000), 140 Ohio App.3d 812, 815,749 N.E.2d 772.
[21] Rand v. Rand (1985), 18 Ohio St.3d 356, 359, 481 N.E.2d 609.
[22] Hess v. Riedel-Hess, 153 Ohio App.3d 337, 2003-Ohio-3912,794 N.E.2d 96, at ¶¶ 11-12 (citations omitted); see, also, O'Brien v.O'Brien, 5th Dist. No. 2003-CA-F12069, 2004-Ohio-5881, at ¶ 77- ¶81.
[23] See Inman v. Inman (1995), 101 Ohio App.3d 115, 117-118,655 N.E.2d 199.
[24] Id.