[Cite as *Cook v. Cook*, 2019-Ohio-1961.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| JULIE M. COOK | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | : | Hon. Earle E. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 18 CAF 09 0072 |
| NORMAN G. COOK | : |  |
|  | : |  |
| Defendant-Appellant | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING: Civil appeal from the Delaware County Court of Common Pleas, Domestic Relations Division,  Case No. 16 DR B 12 0585

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: May 20, 2019

APPEARANCES:

For Plaintiff-Appellee

DOUGLAS WARNOCK
20 East Central Avenue
Delaware, OH 43015

For Defendant-Appellant

JOHN COUSINS IV
32 W. Hoster Street
Suite 100
Columbus, OH 43215

*Gwin, P.J.*

**{¶1}** Husband appeals the August 30, 2018 judgment entry of the Delaware County Court of Common Pleas, Domestic Relations Division, overruling his objections to the May 21, 2018 magistrate's decision.

*Facts & Procedural History*

**{¶2}** On December 14, 2016, appellee Julie Cook ("Wife") filed a complaint for divorce against appellant Norman Cook ("Husband"). The parties were married on June 16, 2014. The parties did not have any children with each other, but each had children from previous marriages. On June 14, 2017, Husband filed a motion for contempt against Wife. Wife filed a motion for contempt against Husband on July 27, 2017. On August 17, 2017, the magistrate found Husband in contempt for failing to make the premium payments required to maintain health insurance coverage for Wife. Husband filed objections to the magistrate's decision, which the trial court overruled on October 10, 2017. Husband was granted exclusive possession of the residence located at 9030 Shaffer Drive in Powell, Ohio on July 12, 2017. As of the date of the trial, Husband has not yet listed the property for sale.

**{¶3}** Husband filed a motion for summary judgment on October 11, 2017, asking the trial court to declare that the $501,246 death benefit, received by Wife as the beneficiary of her ex-husband's life insurance policy, is marital property. Wife filed a memorandum contra on October 25, 2017. The magistrate issued an order denying the motion on November 1, 2017. Husband filed a motion to set aside the magistrate's order on November 10, 2017. The trial court denied the motion on November 15, 2017.

{¶4} The magistrate held a trial on the complaint for divorce on November 29, 2017 and November 30, 2017.

{¶5} On cross-examination, Husband stated he is fifty years old and holds a bachelor's degree in business administration. In 2012, Husband was the president of Timilon Technologies making $150,000 per year. After Timilon, Husband worked for Renegade Brands, making $150,000 per year with an additional $40,000 in bonuses. Husband then went to work for Morgan Stanley. Husband is not sure what he made at Morgan Stanley, but approximately $150,000 per year. There were a few months during the marriage where Husband was unemployed, but he could not recall how long. Husband left Morgan Stanley in June of 2017 and went to work for Halite Partners, where he is currently employed as president and chief marketing officer. Husband described Halite Partners as a start-up company. He did not receive payment for several months, but currently his net pay is $6,000 every two weeks. Husband does not know what his gross pay is from Halite. Husband stated he is in great health.

{¶6} Husband testified Wife owned properties at 226 South Marion Street and 208 South Marion Street in Waldo prior to the marriage. Husband stated these are rental properties and "were a disaster." Husband testified he did incur a significant tax liability at the end of 2014 and while he acknowledged he and Wife offset that tax liability by using the losses from Wife's rental properties, Husband stated he could still amend and re-file the 2014 tax return. Husband knew Wife had loss carryovers from previous years on the rental properties and knew if they filed separate tax returns, he could not use those losses. Husband acknowledged that in 2014 and 2016 he and Wife used Wife's loss carryovers to offset income he otherwise would have paid taxes on.

{¶7}    Husband bought the property at 9030 Shaffer Drive, in Powell, Ohio in May of 2014, a month before he and Wife got married.  The property is deeded in his name only.  Husband testified he and Wife discussed that it was going to be their home together. Husband paid approximately $800,000 for the home.  It was Husband's understanding that Wife was going to sell her home on Glanmore Drive that she owned prior to the marriage.  The actual down-payment for the Shaffer Drive home came from a withdrawal from Husband's IRA that he deposited into his Chase bank account.  Husband stated since Wife had created such financial disarray, including foreclosure of her home on Glanmore, that she wanted to assure him that she was not going to be as irresponsible financially, so Wife wanted him to have the money to be able to move forward with since she knew he had to withdraw money from his IRA to pay for the down-payment.  Husband testified Wife paid him the $203,969 proceeds from the sale of her pre-marital home to be sure Husband married her and thus the $203,969 was a gift from Wife.  Husband stated after he discovered Wife had financial problems, his trust in her declined and this payment was Wife's financial assurance to Husband so that he would marry Wife. Husband testified the money from Wife's house was going to be a contribution to the financial part of their family.  Wife sold her pre-marital home for $203,969 and the money was deposited into Husband's Chase account.  Husband stated Wife paid him this money as a gift.  He does not have any written evidence this money was a gift.

{¶8}    Husband testified his IRA is valued approximately at $365,666.  The parties stipulated that is Husband's separate property.  The parties also agreed Wife's IRA of $51,616.65 is her separate property.

{¶9}    Husband stated he has no money.  Husband has paid all his mortgage payments on his house and utility bills at Shaffer Drive; he had paid all expenses related to the upkeep of the house; and has paid his car loan.  As to the 2014 loan from his parents, Husband testified neither he nor Wife signed the purported loan document.  As to the loan in May of 2017 from his parents, Husband testified Wife was part of the loan because the money went to pay her debts.  However, Husband testified Wife did not know about this loan because he did not tell her about the loan.  Husband knew there was a restraining order against charging credit, but he made a document that purported to obligate Wife on the loan since it was used to pay her debts.  Similarly, Husband sought to obligate Wife on a loan from Mr. Shaffer in August of 2017 that Wife did not know about because Husband stated the funds were used to pay her debts.

{¶10}  On direct examination, Husband testified the properties Wife owned in Waldo were a disaster because Wife had not collected rent for over a year from either tenant and she had not paid the mortgage payments in months.  The purpose of Wife putting the proceeds from the house she owned on Glanmore into his checking account was so they could get married.  Husband testified he and Wife took a loan of $32,000 from his parents.  Husband stated at the time of the marriage, he did not have any debt and he had assets in the form of his income and retirement account.  Husband cannot afford to pay spousal support because he is servicing all of the debt created because of Wife's lack of work, plus the outflow of cash for Wife's personal property that has accumulated debt.  Husband testified Wife's rental properties in Waldo were a "large cash sucking machine."  Husband wanted Wife to sell the properties, but Wife said she could not because they were properties her mother had.

{¶11}  Husband considered the $203,969 down payment from Wife's premarital house a gift.  Husband received the benefit of being able to use that money to reinsert money back into his IRA.  Husband was not happy when Wife ended her employment in 2015.  Husband was not aware during the marriage that Wife was paying a monthly premium for a life insurance policy insuring the life of her ex-husband Richard Spicer ("Spicer").  Husband became aware of this policy after Spicer died.  Husband is asking the death benefit to be marital property subject to division and is asking the $203,969 down payment that originated from Wife's premarital home to be his separate property as a gift.  Husband testified Wife removed multiple items from the home, in violation of the temporary orders.  Husband stated he and Wife borrowed money from his parents several times and Wife knew about all these loans.  Even though the loans are not specifically in Wife's name, Husband is asking the court to consider them marital debts.

{¶12}  Husband testified if he didn't have the debt created during the marriage, he would have put the money in 529's for his daughters.  Husband stated while Wife's daughters go on vacations and have new phones, his daughters cannot go on vacation and do not have new phones.

{¶13}  Chad Baker ("Baker") is a certified financial planner and licensed insurance agent employed by the New York Life Insurance Company.  Baker sold Spicer an insurance policy in 2001.  Wife was present for this transaction, as Baker was doing financial planning for Wife and Spicer.  Baker testified the life insurance policy was part of their family's financial planning in 2001 to protect Spicer's income if he passed away to take care of Wife and the children.  When Spicer and Wife divorced, Spicer agreed to turn the ownership of the policy over to Wife.  Baker testified the policy did not change

and was the same policy, same document, and, on January 28, 2008, Wife became the sole owner of that policy. Baker testified that all times when this policy was in effect, Wife was the named beneficiary. The face amount of the policy is $500,000 and it was straight term life insurance. Baker stated the policy never had any savings, investment, or growth factor in it; never acquired any cash value; and never would acquire any cash value. Baker described the five-year renewable term policy that Spicer had as an insurance policy where the premium is locked in for five years at a time, every fifth year the premium increases, and is guaranteed renewable to age 90, but builds no cash value. During the time the policy was in force, the policy number did not change, the face amount did not change, and the death benefit did not change. Baker testified it is generally accepted in the insurance industry that a five-year renewable term policy like this one is the same policy, as opposed to new policies every five years because if there were a new policy, the insured would have to go through medical underwriting. Baker did not believe a new policy would have been issued after New York Life became aware of Spicer's addiction problem.

{¶14} Baker testified that since 2014, premium payments were made on the policy by automatic deduction from Wife's U.S Bank account. Baker is not aware of any payments Husband made for this policy. As a result of Spicer's death in 2017, Wife was issued a check in the amount of $501,246.58, which represented the face amount of the policy, plus interest.

{¶15} On cross-examination, Baker testified the term "renewable" refers to the fact the insurance company cannot cancel the policy and you have the right to keep the policy until age 90, as long as you pay the premiums. Baker stated he does not consider the

policy itself to be an asset before payment of the death benefit because there is no cash value. Baker was not aware that any monthly premium payments were made by Husband, but was aware of monthly premium payments made by Wife. In December of 2016, the third five-year term lapsed and the monthly premium payment increased. There were no other conditions attached to the renewal of the five-year term, other than the increase in monthly premium.

{¶16} Wife testified she is forty-eight (48) years old with an associate's degree. Wife is not currently employed. Wife did independent recruiting and consulting for several months in 2015, but has not worked since then. Prior to her marriage to Husband, she worked, making approximately $150,000 per year for Quick Solutions and Limited Brands. Wife testified she and Husband began looking for a house in 2014. Wife stated she and Husband agreed she would either not work or work at a very flexible job. Wife testified after Husband got the job at Morgan Stanley, the two of them reached the agreement that she would not work due to his travel schedule and they agreed she would manage the house. Wife stated she has been looking for work and has made more than fifty applications in the last six months. Wife has chronic myeloid leukemia, but the medication she takes is controlling it.

{¶17} Wife claims a marital interest in the Shaffer Drive property because she invested sale proceeds in the amount of $203,969 from the sale of her separate, non-marital property into the purchase of Shaffer Drive. Wife testified that in 2002, she purchased a home at 7713 Glanmore Court in Dublin, Ohio, while married to Spicer.

{¶18} Wife testified her rental properties in Waldo did not make money. Wife and Spicer originally purchased the properties for Wife's parents' to live in. Husband did not

tell Wife that he intends to file amended tax returns for 2014, 2015, or 2016. Wife stated she and Husband benefited from the loss carryovers from the Waldo properties. Wife testified she did get behind on the mortgage at the Glanmore house because she had difficulties in her life, such as her mother passing away and Spicer becoming addicted to drugs. Wife cleared up her foreclosure problems with the Glanmore home in February 2014, prior to her marriage to Husband.

{¶19} Wife stated her credit was adversely affected by the Glanmore foreclosure and Husband had good credit. Wife testified there was no discussion about whether she was going to make a gift to Husband of the Glanmore proceeds and it was not her intention to make a gift of the Glanmore sale proceeds to Husband. Her intention was that it was her investment in their property and she considered it a joint venture together. Husband bought the Shaffer Drive property before they were married. Wife stated there was never any conversation about this money being a gift, but there were conversations with Husband about this being her investment. There was no written evidence of a gift, and no gift tax return filed.

{¶20} Wife testified she and Spicer took out the life insurance policy in 2001 when doing financial planning. When her marriage to Spicer ended, she got the policy. Wife was the beneficiary on the policy, but the policy was designed to take care of Spicer and Wife's two daughters. Wife stated Spicer led a risky lifestyle and she wanted to protect her girls. Wife testified this policy never came up during her marriage to Husband. Wife stated Husband never made any payments on this policy and she and Husband never discussed this policy in relation to their financial planning with each other. Wife understood that the policy was term insurance and had no cash value. Wife testified the

U.S. Bank checking account, in her name only, has always been solely in her name, and all the payments for the New York Life policy since prior to her marriage to Husband came out of that account. The payments for the policy continued to come out of that account during her marriage to Husband. From the time she and Spicer got divorced until Spicer died, Spicer was paying Wife child support on a regular basis, initially paying $812 per month, and then $550 or $575 per month. All child support payments were deposited into the U.S. Bank checking account solely in her name. Wife utilized the child support payments to pay for the life insurance premiums, which were initially $49.50 per month and then increased to $184 per month.

{¶21} Wife testified she never took a loan from Husband's parents in May of 2014. Wife first stated she was not Julie Cook on that date, as is stated in the purported loan agreement, because she and Husband were not yet married. Wife's signature is not on the purported loan document. Wife also denies taking a loan from Husband's parents in May of 2017. Wife stated she did not sign the document, and she had moved out of the home in April of 2017 and had no communication with Husband after that. Wife stated she was aware that Steve Haxton gave Husband $20,000, but it was not a loan she was involved with and she did not sign a promissory note or loan agreement.

{¶22} Wife stated she did not beg Husband to get married and take care of her. She considered Husband to be high-risk because his first two marriages ended when he had affairs and Husband engaged in other behaviors that were high-risk.

{¶23} On cross-examination, Wife testified she does not know whether Husband knew she was paying life insurance premiums. Wife stated the monthly premium was paid by Spicer's child support because every month the child support came into her U.S.

Bank account and the life insurance premiums were paid from that account.  Further, that the account exceeded the premiums at all times.  Wife stated she transferred money during the marriage from their joint account into her U.S. Bank account because she was the one who paid all the bills.  Wife stated she could testify with one-hundred percent certainty that none of Husband's money and none of the money she earned from her employment during the marriage ever paid the life insurance premium.

**{¶24}** Wife stated she physically gave the check for $203,969 to Husband and intentionally gave him the check, but it was not a gift.  Wife testified Husband wanted her to stay home and not work, and there was another point where Husband was upset at her staying home.  Wife stated Husband "loved it when I was benefitting him.  And then, flip of a switch, it changed and everything was awful."

**{¶25}** On re-direct, Wife testified that she and Husband agreed that, during the marriage, she would do all the banking for the family.  Wife had Husband's permission to sign his name to checks.  Wife testified both she and Husband took cash out of the joint account and that is how they conducted their marital business.

**{¶26}** Courtney White, a business valuation and litigation support and forensic accounting expert who was retained by Husband to look at the marital balance sheet and look at various assets and liabilities on that balance sheet testified as to her opinion of how the assets and liabilities should be divided.

**{¶27}** The exhibits introduced at trial demonstrate the Shaffer Drive property is titled only in Husband's name and is mortgaged to Huntington National Bank.  The residence was purchased prior to the marriage, on May 19, 2014, by Husband for $790,000.  The first contract for the sale of the Glanmore property fell through on May 21,

2014, two days after the closing and purchase of Shaffer Drive. Wife entered into a second contract to sell the Glanmore property on June 8, 2014, prior to the marriage to Husband, and the property sold on July 1, 2014, after the marriage to Husband. Husband paid $232,154.33 from his Raymond James IRA as the down-payment for the Shaffer Drive property.

{¶28} The magistrate issued a decision on May 21, 2018. The magistrate found that, pursuant to R.C. 3105.171(H), Husband's holding of the Shaffer Drive property in his name only is not determinative of whether the property is marital or separate. The magistrate stated there is no dispute that the source of the $203,000 was Wife's separate property, as it was proceeds from the sale of her premarital residence. The magistrate considered the totality of the circumstances and found Wife did not intend the $203,000 proceeds to be a gift to Husband, but rather her contribution to the purchase of the home that were traceable.

{¶29} The magistrate found Husband was not entitled to reimbursement for funds lost on the Waldo property because he failed to trace such expenditures by a preponderance of the evidence, and there was no reciprocal analysis of the benefit the Waldo property losses brought to the marriage, as evidenced by the offset against the parties' joint tax liability which was created when taxes were not withheld from Husband's earnings. The magistrate found no evidence of financial misconduct by Wife and found that by Husband's own testimony he was fully aware of the "disastrous" financial condition of the Waldo properties and was aware of the benefit the property losses brought to the tax obligations of the parties. The magistrate noted Husband attempted to introduce

White's testimony in isolation without a complete analysis of the totality of the circumstances.

{¶30} The magistrate denied Husband's motion for contempt, finding Wife was more credible than Husband.

{¶31} As to the $500,000 from the New York Life Insurance policy upon Spicer's death, the magistrate found the death benefit is the asset, not the policy, and there would be no death benefit unless the premiums had been paid. Further, that the portions of a separate, non-martial life insurance policy purchased with marital funds may be marital property, as may be a portion of the insurance proceeds paid if the insurance premiums are paid with marital funds. The magistrate found at the time of Spicer's death, there had been a total of 182 premium payments, of which 32 were paid during the marriage. Thus, if those 32 premiums were paid with marital funds, then the marital interest in the insurance proceeds would be $85,211.92. However, the magistrate determined that since income does not include child support received for children who were not born or adopted during the marriage pursuant to R.C. 3119.01(C)(7)(c), it was not marital property. Further, that any commingling of marital funds with the child support deposits did not convert the child support payments to marital funds pursuant to R.C. 3105.171(A)(6). The magistrate found Wife was able to trace the payments for the life insurance policy to her separate funds, and establish by a preponderance of the evidence that the insurance policy proceeds are her separate property because they were paid for by child support payments. Further, that the monthly insurance premium paid never exceeded the monthly child support received, and the monthly child support was always paid.

{¶32} The magistrate found the following "loan agreements" Husband claims are debts are suspect because they are not actually signed by the parties: $32,000 loan from Husband's parents; $5,000 from Husband's parents; $1,000 loan from Husband's parents; $20,000 loan from Husband's parents; $25,000 loan from Phil Shaffer; and $10,000 loan from Halite. The magistrate stated the loan agreements "appear to be fabricated copies in an attempt by [Husband] to once again create false debt to offset marital assets." The magistrate stated that since the parties failed to provide the trial court with the balances of the financial accounts and debts as of the date of separation and, in particular, because Husband refused to provide evidence of his actual current income and attempted to create false debts, it is impossible for the magistrate to determine the values of such assets and debts for purposes of an equal distribution, or to determine an equitable distribution.

{¶33} The magistrate found neither party should pay spousal support to the other party. The magistrate ordered Husband to pay Wife the amount of $203,963.39 as her interest in the real property on Shaffer Drive and the amount of $10,732 to equalize the property distribution.

{¶34} Husband filed objections to the magistrate's decision on June 4, 2018. Wife filed objections to the magistrate's decision on June 14, 2018. Husband and Wife both filed supplemental objections on August 1, 2018.

{¶35} The trial court issued a judgment entry on August 30, 2018. As to the magistrate's determination with regards to the $203,000, the trial court found the magistrate made a clerical error as to Wife's separate property interest, but otherwise made appropriate findings and conclusions. The trial court found Wife's separate

property interest should be in the amount of $203,969.39, not $203,000.  The trial court found Wife presented sufficient evidence to establish she lacked the requisite donative intent to make a gift.  The trial court stated Wife's testimony that the money was not a gift was cooberated by her testimony that since Husband did not have the funds to make the down payment, she would provide the down payment and he would provide the credit needed for the mortgage and Husband's testimony regarding a loan from his parents supports Wife's position that the funds were not a gift.

{¶36} As to Husband's objection that the magistrate erred by refusing to grant him a distributive award because Wife caused him to incur massive debt and used marital funds to secure the $500,000 death benefit, the trial court found that evidence at trial did not support a distributive award in favor of Husband.  The trial court stated that, contrary to Husband's position, evidence was presented to establish the parties agreed Wife would be a stay-at-home mom for the parties' blended family and nothing presented at trial suggests Wife was responsible for incurring massive amounts of marital debt.  Further, the loss created by Wife's rental properties benefited Husband, as the parties were able to carry a loss forward on their tax returns.  The trial court also found it would not be equitable to award Husband a distributive share based upon his actions throughout the case.  Specifically, Husband attempted to create marital debts by presenting supposed loan agreements between the parties and other people that are not credible.

{¶37} Regarding Husband's objection to the $500,000 death benefit, the trial court determined the evidence supported Wife's position, including a letter from New York Life Insurance Company confirming all the premiums paid on the policy were withdrawn each month from Wife's U.S. Bank account and the statements of Wife's U.S. Bank accounts

showing monthly direct deposits of Spicer's child support payments. The trial court stated that, based upon the exhibits, the child support payments were deposited biweekly and always exceeded the monthly premium payments. While the trial court found the evidence clearly established that marital funds were commingled into Wife's separate funds, Wife proved that the insurance premiums were paid with her separate funds by a preponderance of the evidence, as the magistrate found Wife credible and because the amount of child support coming into the account was never less than the amount leaving the account to pay the insurance premiums.

**{¶38}** The trial court overruled Wife's objections with regard to spousal support and attorney fees.

**{¶39}** Husband appeals the judgment entries of the Delaware County Court of Common Pleas, Domestic Relations Division, and assigns the following as error:

**{¶40}** "I. THE TRIAL COURT ABUSED ITS DISCRETION AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN CONCLUDING THAT JULIE HAD A $203,969 SEPARATE PROPERTY INTEREST IN THE SHAFFER DRIVE RESIDENCE.

**{¶41}** "II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CLASSIFYING THE $500,000 DEATH BENEFIT RECEIVED BY JULIE DURING THE MARRIAGE AS JULIE'S SEPARATE PROPERTY.

**{¶42}** "III. ALTERNATIVELY, THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO GRANT NORM A DISTRIBUTIVE AWARD FROM JULIE'S SEPARATE PROPERTY, OR A GREATER AWARD OF MARITAL PROPERTY."

I.

**{¶43}** In his first assignment of error, Husband argues the trial court abused its discretion in concluding Wife had a $203,969 separate property interest in the Shaffer Drive residence. Husband contends Wife gave him the $203,969 as a gift.

**{¶44}** Property acquired during the marriage is presumed to be marital in nature, while separate property includes any property acquired prior to the marriage. R.C. 3105.171. Commingling of marital and separate property does not destroy the character of the separate property unless its identity is no longer traceable. R.C. 3105.171. However, "it is well-settled that a spouse can change the nature of property, through conduct performed during the marriage." *Nethers v. Nethers*, 5th Dist. Guernsey No. 18 CA 000005, 2018-Ohio-4085. The mostly commonly recognized method for changing the nature of property is through an inter vivos gift of the property from the donor spouse to the donee spouse. The essential elements of an inter vivos gift are: (1) the intent of the donor to make an immediate gift; (2) delivery of the property to the donee; and (3) acceptance of the gift by the donee. *Id.* In this case, Wife delivered the property to Husband by giving him a check and Husband accepted the check. The key issue in determining the nature of the property is "typically whether the donor spouse had the requisite donative intent to transfer an interest to the donee spouse at the time of transfer." *Rank v. Rank*, 10th Dist. Franklin No. 10AP-273, 2010-Ohio-5717. "Donative intent is established if a transferor intends to transfer a present possessory interest in an asset." *Brate v. Hurt*, 174 Ohio App.3d 101, 2007-Ohio-6571, 880 N.E.2d 980 (12th Dist. Warren).

{¶45} Husband first contends the trial court did not properly apply the "family gift presumption." In *Davis v. Davis*, a civil action, this Court held that "when a transaction is made that benefits a family member, there is a presumption that the transaction was intended as a gift." 5th Dist. Stark No. 2003CA00243, 2004-Ohio-820.

{¶46} However, this Court has not applied the family gift presumption in the context of domestic relations proceedings. Instead, this Court has consistently held that, in the domestic relations context, the donee spouse has the burden of proving by clear and convincing evidence that the donor spouse made an inter vivos gift. *Nethers v. Nethers*, 5th Dist. Guernsey No. 18 CA 000005, 2018-Ohio-4085; *Sayegh v. Khoury*, 5th Dist. Muskingum No. CT2017-0010, 2017-Ohio-2889; *Smith v. Smith*, 5th Dist. Muskingum Nos. CT2003-0008, CT2003-0020, 2004-Ohio-408; *Byrd v. Byrd*, 5th Dist. Stark No. 2013CA00005, 2013-Ohio-4450; *Howcroft v. Howcroft*, 5th Dist. Fairfield No. 2010 CA 25, 2010-Ohio-6410. We have characterized clear and convincing evidence as evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Id.*, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). This Court has further held that while the holding of title is not determinative of whether the property is marital or separate property pursuant to R.C. 3105.171(H), such evidence may be considered on the issue of whether the property is marital or separate. *Gibson v. Gibson*, 5th Dist. Tuscarawas No. 2006 AP 01 0009, 2007-Ohio-2087.

{¶47} There is no dispute in this case that the source of the $203,969 came from Wife's separate property and that Wife delivered the check to Husband and Husband accepted the check. Thus, the inquiry focuses on whether the trial court was factually

correct in finding Wife lacked the requisite donative intent to transfer a present possessory interest in the money to Husband. We find the trial court's determination as to Wife's lack of donative intent is not against the weight of the evidence. While Husband testified that Wife paid him the $203,969 to be sure he would marry her despite her financial issues and Husband's declining trust in her and thus the $203,969 was a gift, Wife testified it was not her intention to make a gift of the sale proceeds to Husband, and there were never any conversations between her and Husband about the proceeds being a gift. Wife stated there were conversations between her and Husband about this being her investment. Wife also testified that since Husband did not have the funds to make the down payment for the Shaffer Drive residence and she did not have the credit to secure the mortgage for the Shaffer Drive residence, they agreed she would provide the down payment and he would provide the credit to secure the mortgage.

**{¶48}** The magistrate specifically found Wife to be more credible than Husband. The weight to be given to the evidence and credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), certiorari denied, 498 U.S. 881, 111 S.Ct. 228, 112 L.Ed.2d 183 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415 674 N.E.2d 1159 (1997).

**{¶49}** Further, the trial court did address the "family gift presumption" and determined that if the "family gift presumption" applied, Wife sufficiently rebutted the presumption by presenting sufficient evidence that she lacked donative intent. Based

upon the evidence as reviewed above, we find there was competent and credible evidence to support the trial court's determination.

**{¶50}** Husband's first assignment of error is overruled.

II.

**{¶51}** In his second assignment of error, Husband contends the trial court abused its discretion in classifying the $500,000 death benefit received by Wife during the marriage as her separate property.

**{¶52}** Pursuant to R.C. 3105.171(B), "[i]n divorce proceedings, the court shall * * * determine what constitutes marital property and what constitutes separate property. In either case, upon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section." The party to a divorce action seeking to establish that an asset or portion of an asset is separate property, rather than marital property, has the burden of proof by a preponderance of evidence. *Zeefe v. Zeefe*, 125 Ohio App.3d 600, 709 N.E.2d 208 (8th Dist. Cuyahoga 1998). The characterization of property as separate or marital is a mixed question of law and fact, and the characterization must be supported by sufficient, credible evidence. *Chase-Carey v. Carey*, 5th Dist. Coshocton No. 99CA1, 1999 WL 770172. "Trial court decisions on what is presently separate and marital property are not reversed unless there is a showing of an abuse of discretion." *Vonderhaar-Ketron v. Ketron*, 5th Dist. Fairfield No. 10 CA 22, 2010-Ohio-6593.

**{¶53}** Husband argues the death benefit is marital property because it was an asset acquired during the marriage, either upon Spicer's death in 2017 or upon renewal of the policy in 2016. We find there is competent and credible evidence to support the

trial court's determination. A life insurance policy that has a cash value is an asset, and if the cash value was generated by using marital funds, the cash value is a marital asset. *Goswami v. Goswami*, 152 Ohio App.3d 151, 2003-Ohio-803, 787 N.E.2d 26 (7th Dist. Belmont). However, Baker testified the policy at issue in this case was straight term life insurance and the policy never had any savings, investment or growth factor in it. Further, that the policy never acquired any cash value and never would acquire any cash value. Baker stated that since the policy was purchased in 2001, Wife has always been the named beneficiary. Wife acquired the policy and her interest in the policy prior to the date of the marriage to Husband.

{¶54} Baker described the policy as one where the premium is locked in for five years at a time, and every fifth year the premium increases, but builds no cash value. Baker testified that, during the time the policy was in force from 2001 to when Spicer died, the policy number did not change, the face amount did not change, and the death benefit did not change. Baker testified it is generally accepted in the insurance industry that a five-year renewable policy is the same policy, not a new policy issued every five years when it is renewed, because if there were a new policy issued every five years upon renewal, the insured would have to go through medical underwriting every five years.

{¶55} Alternatively, Husband contends the death benefit became marital property once Wife utilized marital funds to pay for the premiums, as Wife deposited marital funds into the U.S. Bank account from which she paid the premiums. Portions of insurance policies paid for with marital funds are marital assets. *Babka v. Babka*, 83 Ohio App.3d 428, 615 N.E.2d 247 (9th Dist. Summit 1992); *Burkhart v. Burkhart*, 10th Dist. Franklin No. 11AP-39, 2013-Ohio-157. We find there is competent and credible evidence to

support the trial court's determination that Wife was able to trace the premium payments to her separate funds and establish by a preponderance of the evidence that the proceeds are her separate property because they were paid for by child support payments.

{¶56} Wife testified Husband never made any payments on the policy and she and Husband never discussed the policy. Wife stated all the policy premiums before and after her marriage to Husband came from her U.S. Bank account. Wife testified that from the time she and Spicer got divorced until Spicer died, Spicer paid her child support on a regular basis, initially paying $812 per month and then either $550 or $575 per month. Wife stated all of Spicer's child support payments were deposited in the U.S. Bank account solely in her name. Wife testified she utilized the child support payments to pay for the life insurance premiums, which were initially $49.50 per month and then increased to $184 per month.

{¶57} Baker testified the premium payments were made on the policy by automatic deduction from the U.S Bank account. Baker is not aware of any payments Husband made for this policy. Although income received by either spouse during the marriage is considered marital property, the definition of "income" in the child support context does not include child support received by an obligee. R.C. 3119.01(C)(7)(c).

{¶58} Husband contends since Wife acknowledges that she sometimes placed marital funds into the U.S. Bank account to pay bills, the trial court's determination that the death benefit was her separate property was an abuse of discretion. However, R.C. 3105.171(A)(6)(b) states, "the commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."; See also *Cooper v. Cooper*, 5th

Dist. Licking No. 14 CA 100, 2015-Ohio-4048. We find the trial court's determination that the premium payments and child support payments were traceable to be supported by competent and credible evidence. A letter from the New York Life Insurance Company confirmed all premiums paid from the policy were withdrawn each month from Wife's U.S. Bank account. Further, the statements from Wife's U.S. Bank account show monthly direct deposits of Spicer's child support payments. The child support payments were deposited biweekly and always exceeded the amount for the monthly premium payment. The amount of child support coming into the account was never less than the amount leaving the account to pay the insurance premium. Additionally, the magistrate found Wife's testimony that she utilized the child support payments to pay for the life insurance premiums credible. The weight to be given to the evidence and credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), certiorari denied, 498 U.S. 881, 111 S.Ct. 228, 112 L.Ed.2d 183 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415 674 N.E.2d 1159 (1997).

{¶59} Husband's second assignment of error is overruled.

III.

{¶60} In his third assignment of error, Husband argues the trial court erred when it failed to grant him a distributive award from Wife's separate property or a greater award of marital property. We disagree.

{¶61} R.C. 3105.171(B) requires the trial court to determine what constitutes marital property and what constitutes separate property. The Revised Code further

requires that a trial court divide the marital property equally unless an equal division would be inequitable, in which case "the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." R.C. 3105.171(C)(1). The court may make a distributive award to facilitate, effectuate, or supplement a division of martial property. R.C. 3105.171(E)(1). A trial court in any domestic relations action has broad discretion in fashioning an equitable division of marital property. *Berish v. Berish*, 69 Ohio St.2d 318, 432 N.E.2d 183 (1982). The trial court's judgment cannot be disturbed on appeal absent a showing that the trial court abused its discretion. *Id.*

{¶62} Husband contends a greater award of marital property to him or a distributive award from Wife's separate property is required because Wife caused him to incur a "mountain of debt." The trial court found Husband's position is contradicted by the evidence. We find the trial court's determination is supported by competent and credible evidence. We first concur with the magistrate that since the parties failed to provide the trial court with balances of the financial accounts and debts are of the date of separation and because Husband refused to provide evidence of his actual current income and attempted to create false debts, it is impossible to determine the value of assets and debts for purposes of an equal or equitable distribution.

{¶63} Husband described Halite, his current employer, as a start-up company. Husband testified his current net pay is $6,000 every two weeks, but then stated that amount is his gross pay. He did not submit any other evidence as to his current salary.

{¶64} Wife testified the parties agreed she would be a stay-at-home mom and be responsible for the home and blended family. The only evidence of a "mountain of debt"

incurred is the testimony of Husband of multiple loans from his parents, a loan from Shaffer, and a loan from Halite. However, Husband testified that Wife did not know about several of these purported loans, but he felt they were marital debt because they were used to pay Wife's debts. Wife testified she did not know about these loans. The purported loan agreements are not signed by either Husband or Wife. Additionally, though Husband claims Wife's Waldo properties caused Husband to incur debt, the loss incurred on Wife's Waldo properties actually benefited Husband because the parties were able to carry a loss forward on their joint tax returns. The trial court also found a distributive award was not appropriate, given Husband's attempt to create marital debts by presenting supposed loan agreements between he and Wife and other people that are not credible. We find such a determination is not an abuse of discretion.

{¶65} Husband's third assignment of error is overruled.

{¶66} Based on the foregoing, Husband's assignments of error are overruled.

{¶67} The August 30, 2018 judgment entry of the Delaware County Court of Common Pleas, Domestic Relations Division, is affirmed.

By Gwin, P.J.,

Baldwin, J., and

Wise, Earle, J., concur

_____
HON. W. SCOTT GWIN

_____
HON. CRAIG R. BALDWIN

_____
HON. EARLE E. WISE, JR.

WSG:clw 0507

[Cite as *Cook v. Cook*, 2019-Ohio-1961.]